98:36 LRA 69n

### RIVARD v. RIVARD.

1. APPEAL—REVIEW OF CASE.

   Cases will be reviewed and disposed of in the Supreme Court upon the points and theories presented in the court below.

2. WILLS—UNDUE INFLUENCE.

   Undue influence is not exercised openly, but, like crime, seeks secrecy in which to accomplish its poisonous work. It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary for the exercise of such control.

3. SAME—SUFFICIENCY OF EVIDENCE.

   In a contested will case, it appeared that, soon after the execution of the will, the testator commenced, by codicils, to diminish the shares of some and increase those of others of his devisees, until in this way, and by deeds of conveyance, he had practically disinherited all but two of his seven children, and left to the two almost the entirety of an estate worth from $250,000 to $400,000; that some of the disinherited children were in greater need of his bounty than the two favored ones; that, of the latter, one of them lived with the testator for about five years before his death, and the other was a frequent visitor, and in consultation with the testator; that, after some of these interviews, the testator made remarks against one of his disinherited sons, and spoke about fixing interests differently. *Held*, that there was substantial evidence to go to the jury on the question of undue influence.

4. SAME—MENTAL COMPETENCY OF TESTATOR—APPEAL—SUFFICIENCY OF OBJECTIONS TO TESTIMONY.

   An objection to a question, calling for the opinion of a non-expert witness as to the mental capacity of a testator, as "incompetent," is too indefinite to enable the party objecting to raise the point on appeal that the witness had not shown sufficient facts and knowledge upon which to base an opinion.

5. SAME—EVIDENCE—NON-EXPERT WITNESS.

   A witness who has described looks and actions and language of a testator, inconsistent with a normal state of mind, is

properly permitted to express an opinion that he was mentally unsound.

6. TRIAL—HYPOTHETICAL QUESTIONS—PROCEDURE.

Where it is sought to introduce the opinions of experts upon hypothetical facts, the usual and better practice is first to introduce all of the evidence to support the facts assumed by the question. If, however, after the close of the testimony, it be found that such question assumed the existence of facts which there is no testimony to support, the opposing counsel should move to have the answer stricken out, and excluded from the consideration of the jury.

7. WILLS—MENTAL CAPACITY—HYPOTHETICAL QUESTIONS.

The statements embraced in an hypothetical question to a medical expert, calling for his opinion as to the mental competency of a testator, should be limited to facts which, if true, are indicative of mental unsoundness.

8. SAME—MORAL OBLIGATIONS OF TESTATOR.

An hypothetical question to a medical expert, calling for his opinion, upon the facts assumed, as to the mental capacity of a testator, is not objectionable because it includes the question of his power to comprehend "his *moral* obligations to others, and the proper objects of his bounty," where, from the context, it would be readily understood that the obligations referred to were those which a parent owes to his children.

9. EXPERT TESTIMONY—CHARACTER AND WEIGHT OF.

The testimony of experts is to be treated like that of other witnesses, and it is for the jury to judge of the weight to which it is entitled, without discriminative instructions from the court.

10. APPEAL—HARMLESS ERROR.

A judgment will not be reversed for trivial errors in the admission of testimony which cannot in reason be presumed to have affected the result.

11. WILLS—MENTAL COMPETENCY—DELUSIONS.

Where a testator disinherits a daughter upon the belief that she is a bad woman or that she is not his own offspring, or a son upon the belief that he is a drunkard, or his grandchildren upon the belief that their father (the testator's son-in-law) has threatened to kill him, and it appears that there is no foundation in fact for such beliefs, but that they are mere delusions, the will is void, notwithstanding the testator was entirely sane upon all other subjects, and fully competent to manage his business affairs.

12. SAME—NATURAL JUSTICE.

The fact that a will is contrary to natural justice may be taken into consideration in determining the competency of the testator to make it.

Error to Wayne; Frazer, J. Submitted March 3, 1896. Decided March 31, 1896.

Charles Rivard and others appealed from an order of the probate court allowing the will of Ferdinand C. Rivard, deceased. From a judgment for contestants, Paul Rivard and Ephraim Rivard, executors and proponents, bring error. Affirmed.

Ferdinand C. Rivard died testate in 1892, at the age of 82 years. He owned a farm of 400 acres, situated about six miles from the city of Detroit, on the road to Grosse Pointe. There he was born and always lived. A part of the farm he inherited. The rest he obtained by purchase. He was a shrewd, careful, economical man. He amassed considerable property, and at his death owned some real estate in the city of Detroit, and two farms in Macomb county, besides considerable personal property. His wife died in 1874. Shortly after her death he made his will, dated September 12, 1874. He afterwards executed 12 codicils thereto, dated, respectively, as follows: (1) July 6, 1875; (2) August 28, 1880; (3) September 11, 1880; (4) same date; (5) August 25, 1882; (6) May 9, 1883; (7) February 7, 1885; (8) March 16, 1886; (9) April 2, 1886; (10) May 23, 1888; (11) May 28, 1888; (12) May 26, 1890    He had seven children,— three sons and four daughters,—all of whom were living when the original will was made. By this will he made an equitable division of his property among his children. By his various codicils he took away the larger share given by the first will to five of his children, and left most of it to his two sons Paul and Ephraim. The will is attacked upon the ground of incompetency and undue

influence.   These questions were submitted to a jury, who decided in favor of the contestants.

His daughter Archange was married to a Mr. Connor in 1870.   This marriage was unfortunate, Mr. Connor being a spendthrift and a man of bad character.   She had eight children, and in 1881 she left him, and, at her father's request, took them all, and went to his house to live.   His daughter Pauline, in 1870, married a Mr. Lodewyck.   She died May 19, 1880, leaving five children. These children went to their grandfather's to live after her death.   About four months after her death, Rose married Mr. Lodewyck.   Mr. Rivard naturally was opposed to the marriage in so short a time after the death of Pauline.   He refused his assent, whereupon Rose and Lodewyck went away, and were married without his knowledge.   Julia, at 19 years of age, left home, lived some three years with Mr. and Mrs. Lodewyck, and then entered a convent.   Charles, who by the first will was made equal with Paul and Ephraim, was by one of the codicils bequeathed only a life estate.

Errors are assigned upon the refusal to give certain instructions requested by the proponents, in giving certain instructions requested by the contestants, in giving certain oral instructions, and in the exclusion and admission of testimony.

The court, at the request of proponents, after stating the statute of wills, and the power of every person to devise his property, instructed them as follows:

"1. The intention of the statute of wills is that every one of full age and sound mind shall be at liberty, in making a will, to select the objects of his bounty, among his relatives, at discretion, or to pass them all by, if he is so disposed.

"2. The court or jury cannot interfere with a testator's voluntary and intelligent bequests, or inquire into the propriety of any disposition he chooses to make, so long as the will is not unlawful in its terms, and is legally executed."   To this request the court added, "and the testator is, at the time of its execution, of sound mind."

"3. And the question as to the capacity of the one who makes the will must refer to the will in question,—not his capacity to make any will in general,—and must refer to the time when the will was made.

"4. If the testator intends, of his own free will, to make certain dispositions of his property; if he is capable of knowing what he is doing, of understanding to whom he gives his property by his will, and in what proportions, and what heirs he is depriving of property,—this is sufficient to sustain the will, if he, at the time of making such will, is of sufficient age and sound mind.

"5. It is not necessary that Ferdinand C. Rivard should have had the same perfect and complete understanding of all matters relating to his property, and all their bearings, that a person of good and vigorous health might have had; nor is he required to know the precise legal effect of every provision in the will." To this the court added, "provided he is at the time of sound mind."

"6. The capacity to make a contract is sufficient to make a will, and a less degree will answer for making a will than a contract.

"7. The will will not be set aside merely because its maker was weak, or sometimes foolish, or lacked the average mental capacity of his neighbors, or did not dispose of his property as others, who knew nothing of his reasons, might think he ought to have done." To this the court added, "if he was of sound mind at the time he executed it."

"8. It is immaterial that by the provisions of the will any child or children or grandchildren were disinherited, or the provision that was made for them in the will was subsequently changed by the codicils. It is immaterial whether the provisions of the will are or are not such as the jurors may think ought to have been incorporated in it. This is no reason for setting aside the will, provided that the jury find that at the time of the making of it the testator was of full age, and sound mind sufficient to understand its meaning, the objects to whom these bequests were made, and the child or children he had disinherited.

"9. It is not necessary that the evidence should show what, in the opinion of the jurors, may have been a sufficient reason for omitting any one or more of his heirs from the provisions of the will. The justice or injustice of such omission cannot be inquired into, providing the testator was of full age and sound mind,

and acted without any undue influence, and understood fully what he was doing, when he made the will by which he omitted any one or more of his heirs from the bequests.

" 10. The evidence is undisputed that for 30 years before his death the testator, Ferdinand C. Rivard, carried on his business of farming, made contracts and leases, bought and sold real estate and personal property, and that no one, so far as the evidence shows, ever questioned his mental capacity or competency to do so.   These facts may be taken into consideration by the jury, and given weight by them, in determining the question as to whether, when he executed the will, he was of sound mind.

" 11. Even if the jury believe some of the provisions of the will betray ingratitude and the want of natural affection, showing that he did not distribute his estate equally among his relatives, still those facts alone do not prove the want of testamentary capacity."   This request is marked, " Given as modified;" but there is nothing to show how modified, unless it be by the oral charge of the court.

" 12. If Ferdinand C. Rivard, at the time of making his will, knew the nature and effect of it,—knew his children, and the circumstances of each of them in life; the extent of his property, and the scope and bearing of the provisions of his will; how much he was giving to each, and the way he was giving it, and which of them he was passing by,—and gave the property according to his free will and wishes, and he was of sound and disposing mind and memory, and competent to make it, his will would be valid, and should stand.   It was his right to make it, and not the right of the jury to make or unmake it for him.

" 13. A testator has the capacity that his will shows him to possess.

" 14. A testator competent to make a will has the right to make it as he wills and wishes, and is not required to give any reasons why he has made it in the way he has."

15. The court, at proponents' request, also instructed the jury to find, in answer to special requests, that the testator, when the will was executed, did know the extent and value of his property, and also knew his children.

16. John Ward, an attorney of long standing and experience in the city of Detroit, was the attorney for Mr. Rivard for many years; drew the will and the codicils.

Contestants' counsel argued to the jury that Mr. Rivard was unduly influenced by Mr. Ward. The court, at proponents' request, instructed the jury that there was no evidence to show any undue influence on the part of Mr. Ward to bring about either the will, or any codicil to it, but did not, as requested, instruct them to disregard the arguments of counsel for the contestants on this point.

The court gave the following requests on the part of the contestants:

"1. It is essential to the validity of a will that the person making it be of sound mind, and that its provisions be the real wish of the testator himself, freed from all undue influence affecting its provisions.

"2. While the undue influence which operates to defeat a will must be such as to overcome the free action of the mind at the very time of making the testamentary disposition of the property, it is also true that the pressure may sometimes have been brought previously. If such pressure had been brought previously, and remained, so as to coerce the mind of the testator at the time the will was executed, it cannot be upheld.

"3. Proof of undue influence must be made out, in most instances, by proof of facts and circumstances. Such facts and circumstances, standing alone, may be trivial, but when taken together, and considered in relation to all the other facts of the case, must satisfy the jury of its existence.

"4. In order for the jury to find that Rivard was of sound mind, the jury must be satisfied that at the time of making the will he not only had sufficient memory to recall the several persons who might, or ought to be, the fitting objects of his bounty, but sufficient understanding to comprehend his relationship to them, their relationship to him, and their claims upon him.

"5. It is essential to the exercise of the power to make a will that a testator shall understand the nature of the act he is doing, that he shall be able to comprehend and appreciate his relationship to others who might or ought to be the objects of his bounty, and that nothing shall so far influence his will in disposing of his property as to bring about a disposition of it which, if his mind had been sound, would not have been made.

"6. It is essential to the exercise of the power to make a will that the testator be able to comprehend and appre-

ciate his relations to others who might or ought to be the objects of his bounty, and that no disorder of the mind shall so far poison his affections, pervert his sense of right, or prevent the exercise of his natural faculties, as to render him incapable of such comprehension and appreciation, and to bring about a disposal of his property which, if his mind had been sound, would not have been made.

"7. If insane suspicion or insane aversion takes the place of natural affection; if reason and judgment are lost, and the mind becomes wild, and its functions disturbed, so as to lead to a testamentary disposition due only to such influences,—then the condition of testamentary capacity fails, and a will made under such circumstances cannot stand.

" 8. In determining the question of a testator's capacity, the jury are at liberty to consider the character of the will itself,—whether simple in its provisions and applications, or otherwise; the jury being instructed that the question of capacity always relates to the capacity of the testator to make the particular instrument in controversy.

" 9. The jury may consider the nature and character of the will, and, if it be contrary to natural justice, this, with the other facts of the case, may be considered by the jury in the determination of the question whether or not the testator was of sound mind.

" 10. In determining the question of testator's capacity, the jury are at liberty to consider whether or not the claims of near relationship have been disregarded; and, if they find that such claims have been so disregarded, they may consider that fact, in connection with the other circumstances of the case, and give it such weight as, in their sound judgment and discretion, they think it entitled to.

"11. In determining the question of testator's capacity, it is the duty of the jury to consider all the facts which, by a preponderance of evidence, they find to be true. If these facts, taken together, and rightly considered by the jury, fail to satisfy them that, at the time of making the will, Rivard was capable of comprehending and appreciating the claims which his children had upon him, then they may reject it.

"12. It is essential to the making of a valid will that the testator be of disposing mind and memory. Failure of memory, if the jury find it to have existed, may be considered by the jury, in connection with all the other

circumstances of the case, in determining testator's capacity; and they are at liberty to give it such weight as, under all the circumstances of the case, they, in the exercise of their sound judgment and discretion, think it entitled to.

"13. If the jury believe that the testator was laboring under partial insanity or monomania, and that the will was the direct offspring of such partial insanity or monomania, then the jury is instructed that the will must be regarded as invalid, even though the general capacity of the testator to do ordinary business be unimpeached, provided such monomania so affects the testator, in the making of his will, as to show him to be of unsound mind in that particular.

"14. The instructions given as to the capacity to make the will are equally applicable to the capacity to make the codicils, and must be so regarded by the jury.

"15. The jury is instructed that, while a man is not to be regarded of unsound mind simply because the provisions of his will are unjust, yet the jury have a right to take into consideration the provisions of his will; and if they find them to be unjust, in view of the claims that his children rightfully had upon his bounty, the jury have a right to consider this fact, in connection with all the other circumstances of the case, in determining whether or not the testator was of sound mind.

"16. The jury is instructed that if Rivard was of sound mind, and desired to prevent Lodewyck from having any benefit from whatever share of his property he might desire Pauline's children to receive, it was not necessary for him to cut off such children absolutely, as was done by the codicil of February 7, 1885. He could have vested the title in a trustee for the benefit of such children during their lives."

After reading to the jury the above requests, the court gave the jury oral instructions, the material parts of which, affecting the questions raised, are as follows:

"Testimony has been introduced in this case showing, or tending to show, that the testator, Ferdinand C. Rivard, was disturbed by fear of some impending danger, that he was unkind to his wife and children, that he was cruel in his treatment of domestic animals, that he demanded of his children strict obedience, that he restricted them in their pleasures, and that he exhibited other peculiarities

in his conduct. All this testimony is introduced for the purpose of showing you what kind of a man Ferdinand C. Rivard was. These doings have been met by disclaimer on the part of proponents of this will, and evidence has been introduced tending to maintain their position. That is, the evidence on the part of the proponents has disputed the propositions of contestants; and, as to the truth or falsity of the evidence on these questions, I leave that to you. A great deal of evidence has been introduced in this case to show that Ferdinand C. Rivard was a man capable not only of comprehending the property he possessed, the nature of it, of knowing the land he owned, and its boundaries, but that he was shrewd in making a bargain, and that he was generally competent to conduct business affairs. I think there is not any evidence in this case that would warrant you in finding that Ferdinand C. Rivard was not a man of ordinary business capacity, and that this business capacity continued up to his death. I have no doubt, from the evidence, that he was capable of understanding what property he possessed, and that he was capable of managing it successfully. Neither do I think the evidence in this case would warrant you in finding that he was a man who did not know his children when he met them, and that he did not know his grandchildren, and what relation they were to him.

"But the main and all-important question—it seems to me—for you to consider is whether, under the evidence in this case, Ferdinand C. Rivard was of sufficiently sound mind to comprehend the obligations he was under to his children, and those who were dependent upon his bounty, or entitled to his bounty, and it is for the purpose of enlightening you upon this question that so much of this evidence has been introduced. And, in considering this question, it is your duty to examine carefully into the conduct and behavior of the testator towards his wife and children and those surrounding him, so that you may form a clear insight into the real condition of the testator's mind. And it is with the view of enlightening you on this question that this evidence in regard to his treatment of animals that surrounded him was introduced, so that you may justly judge as to the character and condition of the testator's mind. * * *

"A man may be perfectly sound, and able to conduct his business and understand his affairs, and even to know to whom he has given his property, and still be in such

a condition of mind that he is incapable of comprehending his duties towards others. In other words, he may be perfectly sound in many particulars, and be unsound in others, or some one particular. This is what is known as 'monomania.' If a person is a monomaniac, and his will is affected by the peculiar character of his mania to such an extent that a jury shall believe that he is of unsound mind, then that will is not the will of the person executing it, because it is the will of a man of diseased or unsound mind, in that particular. So you see that in this case it is necessary for you to discriminate in the application of this testimony as to the particular thing in which this testator is claimed not to have possessed sufficient intellect or capacity to execute this will.

"You are at liberty, also, to take into consideration the terms of the will itself, not for the purpose of substituting your opinion for the opinion of the testator as to the manner in which he should have disposed of his property, but for the purpose of ascertaining, and from what has been shown by all the testimony in this case, taking into consideration every characteristic of this man, and his conduct through all his life, whether such a will would be the product of such a man with a sound or unsound mind.

"You are also at liberty, for the purpose of determining this proposition, to take into consideration the reasons that have been assigned for the disposition of the property in the manner it has been disposed of by this will, not for the purpose of deciding or determining whether you would make such a will or not, but for the purpose of determining whether Ferdinand C. Rivard—such a man as the testimony in the case has shown him to be—would or would not, if he was a man of sound mind, be actuated by the reasons assigned. In other words, all the testimony is simply for the purpose of enabling you to arrive at a conclusion as to the condition of this man's mind, as judged by his acts.

"A man owes certain duties to his family,—to those he has been instrumental in bringing into the world. He is under certain legal and moral obligations to them, and, if these obligations are overlooked or disregarded, then it is important for you to inquire whether the reasons that are assigned for overlooking or disregarding these duties were such as actually operated upon him, if his mind was sound, in so doing. If they did, and the reasons were sufficient to him, and his mind was sound, then this will

cannot be set aside; but if, on the other hand, these reasons indicate to you, together with all the testimony in this case, that the mind of Ferdinand C. Rivard was not sound in this regard, then you are as much at liberty to deny this will to probate as if he were incompetent in every particular, if the incompetency which you find affected the provisions of the will that is here presented."

The court refused to instruct the jury that there was no evidence of undue influence, or incompetency to make the will; also, that if he was of sound mind, sufficient to enable him to buy and sell and deal in property on the basis of contract, or to buy for cash, to give deeds and leases, and to make gifts, this implied sufficient capacity to devise his property by will; also, that if he was nervous, of violent temper, and unjust in his dealings, or tyrannical, these, of themselves, do not prove anything against his testamentary capacity; also, that expert testimony of the kind given in this case is uncertain and unreliable, and but little weight should be given to it.

Two other questions, in addition to those above mentioned, were proposed by the proponents:

"When the instrument was executed, did the testator understand the provisions made for his children, and did he understand how to make them?

"Did the testator, at the time the will was made, and when the changes were made by codicils, act upon reasons satisfactory to himself, in making the several changes?"

The above is a sufficient statement of the case. Any further reference to facts will be made in connection with the points raised.

*John Ward* (*Henry M. Cheever* and *John Atkinson*, of counsel), for appellants.

*Don M. Dickinson* (*Samuel S. Harris* and *John D. Conely*, of counsel), for appellees.

GRANT, J. (*after stating the facts*). 1. The court did not err in refusing to instruct the jury that there was no evidence of undue influence. It must be borne in

mind that the first will was a fairly equitable division of the testator's property among his children. This was in accordance with the natural affection which every father is supposed to have for his offspring. There is no evidence that any influence was exercised over Mr. Rivard in the execution of that will, or that there was then any alienation of affection between him and any of his children. If the case had been tried upon the theory that this will was valid, and must stand, although it were established that the codicils were invalid on account of undue influence or incompetency, a different and important question, upon which we find no decision by this court, would have been presented. It was, however, presented to the court and jury upon the theory that the execution of a codicil is a re-execution of the entire will, and that, if there was such undue influence or incompetency as would invalidate the codicils, it would invalidate the entire will. All through the trial the original will and the codicils were referred to as one will. No request was made to instruct the jury upon this theory. It was raised in this court for the first time. Cases will be reviewed by the appellate courts upon the points and theories presented to the *nisi prius* courts. No better illustration of the justice of this rule can be found than the present case. Had the proponents desired to make this issue, it was their clear duty to have done so in the court below. We therefore refrain from discussing this question, or commenting upon the authorities cited.

Soon after the execution of the original will, Mr. Rivard commenced, by codicils, to diminish the shares of some and increase those of others, until finally, by these codicils and deeds of conveyance, he had practically disinherited all but Paul and Ephraim, and left to them almost the entirety of a property worth between $250,000 and $400,000. Some of those whom he thus disinherited were in more need of his bounty than Paul and Ephraim, because they were less able to take care of themselves, and were possessed of less property. Every person will

naturally say that some good reason. must be found to account for such a disposal of a large property by a parent. Undue influence is not exercised openly. Like crime, it seeks secrecy in which to accomplish its poisonous work. It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary for the exercise of such control. *Marx* v. *McGlynn*, 88 N. Y. 357; *Hartman* v. *Strickler*, 82 Va. 237; *Porter* v. *Throop*, 47 Mich. 324. It is unnecessary in this case to go to the extent of the holding in *Marx* v. *McGlynn* and *Hartman* v. *Strickler*, to the effect that the presumption of undue influence arises from the fact that the will is in disregard of a parent's natural affection. Ephraim lived at home, with his father, for about five years before his death. Paul was a frequent visitor, and in consultation with him. There is evidence on the part of the contestants that Mr. Rivard made remarks against his son Charles after his interviews with Paul, and spoke about fixing matters differently. The learned circuit judge submitted this question to the jury, and, upon a motion for a new trial, refused to disturb the verdict. We think he was correct, in that there was substantial evidence for the consideration of the jury.

2. Three witnesses, named Lodewyck, Frech, and Gore, testified that, in their opinion, Mr. Rivard was of unsound mind. The objection made to the inquiry propounded to Lodewyck and Frech was that it was "incompetent, and any inquiry as to his mental soundness or unsoundness must be confined to the time the will was made, and the codicils." Under this objection, counsel can now complain only of the second reason for their objection. The objection that it was "incompetent" is too indefinite. The term includes many reasons which counsel might have had in mind, but which were not apparent to the court.

In *Ward* v. *Ward*, 37 Mich. 258, the objection made

was that the question was "incompetent, irrelevant, and immaterial." The court said:

"The ground of the objection was not stated at all, and, considering the circumstances, the point now urged was not so obvious as to probably occur to the judge's mind on the tender of a general objection. The plaintiff in error is therefore not entitled to insist on the ground here taken."

In *Stevens* v. *Hope*, 52 Mich. 65, it is said:

"Objections made in this form are not entitled to notice, unless it happens that the true point of objection is too palpable to call for anything more definite." See, also, *Brown* v. *Weightman*, 62 Mich. 557; *Seventh-Day Adventist Pub. Assn.* v. *Fisher*, 95 Mich. 274.

Counsel cannot now raise the point that these witnesses had not shown sufficient facts and knowledge upon which to base an opinion.

To similar questions propounded to the witness Gore, the specific objection was made that he had not shown sufficient knowledge on his part to give an opinion. We are all of the opinion that this witness' testimony was competent. He had described looks and actions and language inconsistent with a normal state of mind. We deem it unimportant to state his testimony.

3. Dr. Johnson, a medical expert upon insanity, was produced as a witness for the contestants. A very long hypothetical question was propounded to him. It assumed the existence of certain facts, as all such questions do, which contestants claim they had given testimony to prove. After the statement, the question was, "What have you to say as to the mental condition of this man, from the time of his wife's death down to his death?" The answer was, "The history seems to be that of an insane person, so far as I can judge from the question." After this was answered, a second question was propounded, asking for the witness' opinion whether Mr. Rivard was "capable of comprehending his moral obligations to others, and the proper objects of his

bounty; the relations of his children and grandchildren to him; the situation and disposition of his property so as to hold these in mind; his obligations to others; his consideration of the objects of his bounty; his property, and the extent of it,—so as to be able to make this will and these codicils of his own understanding."

It is now urged that this question was incompetent because it includes certain facts which are indicative of sanity, rather than insanity, and that the jury were given to understand by the question that they were inserted as indicative of insanity. No such objection was made upon the trial, and it will not now be considered by us. The court, of its own motion, did modify some of the hypothetical statements, which were eliminated from the question. If counsel for proponents objected to other statements, they should have called the attention of the court to them. The usual and better practice is to first introduce all the evidence to support the assumed facts stated in the hypothetical question. If, however, after the close of the testimony, it be found that such question contains assumed facts which there is no evidence to support, opposing counsel should move to have the answer stricken out, and excluded from the consideration of the jury. *Wilkinson* v. *Spring Works*, 73 Mich. 418. The competency of such questions is too well established to be now questioned. The duty of the trial judge is to limit the question to those facts which, if the jury find them to be true, are indicative of insanity. The hypothetical question in this case included the facts which the contestants had given evidence tending to sustain.

The second question was attacked in the court below, and is attacked here, upon the ground that it included moral obligations, and that it is of no consequence whether Mr. Rivard did or did not understand his moral obligations to others. It is insisted that the question and answer related to the moral incompetency of the testator, and not to his mental incompetency, which is the test.

The word was evidently not used in regard to the moral character of the testator, or his moral obligations to his neighbors in the business transactions of life. It related to the obligations which a parent owes to his children. He was under no legal obligation to devise his property or leave it to his children who were of age. Certainly, as to those who were not of age, it would not be inappropriate to say that a father owes a moral obligation to his children to provide out of his property the means for their support and education. The term was used with reference to his obligations to his children. The jury could not well have understood it in any other light. There is precedent for its use in this connection. The lord chief justice, in *Banks* v. *Goodfellow*, L. R. 5 Q. B. 549, says:

"Here, then, we have the measure of the degree of mental power which should be insisted on. If the human instincts and affections, or the moral sense, become perverted by mental disease; if insane suspicion or aversion take the place of natural affection; if reason and judgment are lost, and the mind becomes a prey to insane delusions calculated to interfere with and disturb its functions, and to lead to a testamentary disposition due only to their baneful influence,—in such a case it is obvious that the condition of the testamentary power fails, and that a will made under such circumstances ought not to stand."

The rigid cross-examination elicited many things favorable to the proponents, and gave the jury all the essential information for their consideration in determining how much weight they would give to the opinion of the expert. There was no error in admitting this testimony.

4. The court did not err in refusing to instruct the jury that the expert testimony in this case was uncertain and unreliable, and that but little weight should be given to it. *People* v. *Seaman*, 107 Mich. 348.

5. Testimony was introduced by the contestants to show that Mr. Rivard became angry at some of his boys, and sent them away from home, telling them to leave,

and "go and eat mad cow." A Mr. Willemin was sworn for the proponents, and testified that he was a lawyer of 44 years' practice, 20 years in this country, was brought up in Paris, a graduate of the French University, and acquainted with the idioms of the French language; that the French expression for the above is, "*Mangé de la vache enragé*," that it was an expression much used in France, especially among the country people. "It means the same as, 'You go and have a hard time.' Suppose I should tell you the story of my life, and was in Australia part of the time, and fared very bad in that country; I would tell you, '*J'ai mangé de la vache enragé.*' It means you have the hardest time one can ask, to endure hardships."

On cross-examination the witness was asked, "Would you use it to your own children?" He answered under objection and exception. It was probably not proper cross-examination. It had no relevancy to the subject-matter of his testimony in chief. It would, however, be a reflection upon the intelligence of any jury to hold that they could be misled or prejudiced by the answer, which was: "No; I would not, myself." Judgments should not be set aside for such trivial errors.

6. The principles governing the main question in this case have been so frequently and fully discussed in the decisions of this court that we deem it unnecessary to traverse the ground again. To do so would be supererogation. The former distinguished jurists of this court have ably expounded the rules and cited the principles governing all the questions raised. Some of the leading cases are *Beaubien* v. *Cicotte*, 12 Mich. 459; *McGinnis* v. *Kempsey*, 27 Mich. 363; *Fraser* v. *Jennison*, 42 Mich. 231; *Kempsey* v. *McGinniss*, 21 Mich. 123.

Apart from the question of undue influence, which has already been disposed of, the theory of the proponents is that the record contains no evidence of general incompetency, the result of senile dementia or general insanity, or of an insane delusion which affected the testamentary

capacity of Mr. Rivard. Counsel urged, and requested the court to so charge, that Mr. Rivard was competent to attend to his business affairs, to make deeds, leases, and contracts, and was therefore competent to make a will, for the reason that it requires less capacity to make a will than to execute deeds and contracts. If the alleged incompetency depended upon senile dementia or general insanity, counsel's contention, under the instruction of the court as to his competency in this regard, would be correct, and the court should have directed a verdict for the proponents. This rule is settled, not only by the authorities in Michigan, but is recognized by courts generally. The difficulty with this contention is that it does not apply to this case, and the court eliminated it from the consideration of the jury by instructing them that Mr. Rivard was competent to do all these things, and that that competency continued to the end of his life. Counsel ignore the other well-settled rule,—that, while a man may be possessed of such capacity, he still may be unable to execute the will in question, on account of some delusion which has beclouded or taken away his judgment in regard to those who are the natural objects of his bounty. If a testator disinherits a daughter upon the belief that she is a bad woman or that she is not his own offspring, or a son upon the belief that he is a drunkard, or his grandchildren upon the belief that his son-in-law has threatened to kill him, and it appears that there is no foundation in fact for any such beliefs, and they are shown to be mere delusions, a will disinheriting such children and grandchildren is void, notwithstanding he was entirely sane upon every other subject, and fully competent to manage his business affairs. Justice COOLEY makes the distinction clear in his able opinion in *Fraser* v. *Jennison, supra,* at page 231:

"When the monomania is conceded, it is only necessary to inquire further whether the provisions of the will are or are not affected by it, and the will stands or falls by that test. [Citing a large number of authorities.] A

man may believe himself to be the Supreme Ruler of the Universe, and nevertheless make a perfectly sensible disposition of his property; and the courts will sustain it, when it appears that his mania did not dictate its provisions."

The converse of the proposition is true,—that where the monomania or delusion does dictate its provisions, and results in the disinheritance of the subjects of the delusion, whom he would otherwise remember in his will, it cannot stand. We are not dealing with a testator who has no children, but only collateral heirs, to whom he owes no duty, legal or moral, but with a parent, whose disinheritance ought, in the common sense of mankind, to be based upon some good reason. For this reason the court rightly instructed the jury that they might consider the terms of the will, in connection with the other evidence, in determining the question of the monomania or delusion. This is peculiarly true of the present case. These codicils present some peculiar features, which indicate a loss of memory and an unstable character. There were only 2 weeks between the second and third; 17 days between the eighth and ninth; 5 days between the tenth and eleventh; the third and fourth were made upon the same day; the eighth and ninth are identical in language. We find no satisfactory explanation of the execution of these two codicils within a few days of each other. By the sixth codicil he took away from his children all control of his funeral, burial, and selection of his grave and the erection of a monument, and committed it to his attorney, Mr. Ward. He disinherited his youngest daughter. If the testimony of the contestants is worthy of belief, he was under the insane delusion that she was an inmate of a house of ill fame.

There is no shadow of a reason shown for this belief. If the jury found that this insane delusion was the cause of his disinheriting her, it alone would be sufficient to invalidate the will. *Haines* v. *Hayden*, 95 Mich. 332. The delusion in that case was that his wife was unfaith-

ful to him, and that Alice, the daughter who was disinherited, was not his own child.

It was said in *McGinnis* v. *Kempsey*, "If a party makes a will contrary to natural justice, this, with other facts, may be considered." The testator's daughter Rose was about 12 years of age when her mother died. The evidence for contestants showed that she assumed the mother's place in the household; did most of the work; she and her little sister milked the cows, and brought water from the lake, several hundred feet away; that she was faithful, obedient, and uncomplaining; that her lot was a hard one; that she did work which no father, possessed of the property which her father had, ought to permit a daughter to do. Nothing occurred to estrange him from her until her marriage with Lodewyck. There is no evidence that he had any ill will towards Pauline, Lodewyck's first wife. Either from an unfortunate marriage, or from other causes, the mind of his daughter Archange had become unbalanced, and after she left her husband her father took her to an asylum for care and treatment. The common sense of mankind condemns, as contrary to natural justice, a will which practically disinherits such children, and leaves the bulk of a large fortune to two who have done no more than they to deserve it, and are better able to meet the vicissitudes and struggles of life; and courts and juries have the right to take that fact into consideration, in determining the competency of the testator to make the will.

The delusions claimed to directly affect the will are his belief that his daughter Julia, whom he totally disinherited, was an inmate of a house of ill fame; that Charles was a drunkard; and that his son-in-law Lodewyck, whose children he left with a mere pittance, and that tied up with harsh restrictions, had designs upon his life. So far as disclosed upon this record, there was not the slightest foundation for his belief in the unchastity of his daughter or the designs of Lodewyck. There is evi-

dence from which it may be reasonably inferred that he had some foundation for his belief in the habits of his son Charles. Charles, however, was a witness, and the jury had a better chance to judge as to the foundation for his father's treatment, and whether his belief amounted to a delusion.

The evidence of the contestants tends to show a marked change in the habits and character of Mr. Rivard after the death of his wife; that he was afraid of her spirit; that he made his sons and the hired man sleep in the sitting room for some time, all having beds on the floor; that they slept with guns by their sides; that he said to his sons, "Your mother might come, and we had better sleep on the floor;" that he told them to sleep on their backs, so as to listen, for fear she would come, and told them to be ready to grab their guns to shoot if she should come; that he hung sleighbells across the windows; that he attended to the calls of nature in the room at night without using any convenience; that he was accustomed to sit upon his haunches in the house and in the fields, and along the fences; that he exhibited cruelty towards his dumb animals, so extreme and revolting as to be inconsistent with a sane mind; that he sometimes wore summer clothes in winter, and winter clothes in summer; that he sometimes slept with a flannel shirt or drawers tied about his neck, for fear that one of his daughters would cut his throat; and that he furnished diseased meat to eat. Now, while some of these peculiarities would not, of themselves, show incompetency to make a will, still they were important side lights to aid the jury in determining the main issue in the case. *Bitner* v. *Bitner*, 65 Pa. St. 347. It is just to here remark that the testimony of the proponents was in flat contradiction to most of the testimony on the part of the contestants, and, if the jury found that the facts testified to by the proponents' witnesses were true, Mr. Rivard was undoubtedly competent to execute the will, and the will should have been sustained. But these questions of fact

were exclusively within the province of the jury, and they have settled them against the proponents. The charge was very clear in presenting the issue to them, and defining the rules by which they were to be governed. We find no error in the instruction given, or in the refusal to give the requests on behalf of the proponents which were refused.

The refusal to submit the special questions numbered 4 and 5 has not been argued by counsel in their briefs, and therefore will not be considered.

The judgment is affirmed.

The other Justices concurred.