WILSON v. PARKER.

WILLS—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.

The testator was sick with cancer for two years, during which time three operations for its removal had been performed in a hospital. In the summer preceding his death, he declared that he expected his property would go to his heirs, with whom he had always been friendly. He had rooms in the basement of a building, where he did his own cooking, until about a month before his death, when he was taken to his aunt's, and had the care of a nurse and a physician. A few days later, and while so weak that he could not eat solid food, nor sit up all day, the proponent took him eight miles in the country, to proponent's home. After nine days proponent brought him back to his room in the basement, and built a fire, where his will was prepared by a lawyer. He was then taken to his aunt's, and was so weak that he had to be carried up the steps. *Held*, that the opportunity for the exercise of undue influence, with the fact that the will was largely in favor of the proponent, and the suspicious circumstance that he was taken to a cold room to have his will prepared, instead of to his relative's, justified the submission of the question to the jury. GRANT, J., dissenting.

Error to Kent; Wolcott, J. Submitted December 10, 1901. (Docket No. 153.) Decided June 3, 1902.

Abiel A. Wilson presented for probate the last will and testament of George Jerome Parker, deceased. The will was allowed in the probate court, and May Parker, Alice London, and Jane McKenzie appealed to the circuit. From a judgment there for contestants, proponent brings error. Affirmed.

*Wolcott & Perkins*, for appellant.
*McKnight & McAllister*, for appellees.

MONTGOMERY, J. This is a contest over the probate of the will of George Jerome Parker. On the trial at the

circuit the two questions of undue influence and mental incapacity were submitted to the jury, and a verdict denying probate of the will was rendered. The proponent brings error.

At the close of the testimony the proponent made a motion to withdraw the case from the consideration of the jury, and in this court contends that there was no evidence tending to show either mental incapacity or undue influence.

As to the question of undue influence, it may be said that there was no direct proof that at the very time the will was executed any solicitation on behalf of the legatees was made. For evidence of undue influence we must look elsewhere. The immediate relatives of the deceased were Alice London and May Parker, nieces. There was testimony tending to show that the relations between the deceased and these nieces were friendly, and had always been so. The deceased was a farm laborer, who had accumulated about $2,500 through his labor and savings. About two years before his death, a cancer made its appearance upon his lip. He then had an operation, and the cancer was removed, which gave temporary relief. About a year later, another cancer appeared upon his hand. Another operation was performed, but, a short time afterwards, the disease manifested itself in a serious form in his right armpit, and it progressed so rapidly after its first appearance that within a few months he was taken to a hospital, where another operation was performed to remove the same.

For two years prior to his death he had a room in the basement of a building called the "Melrose Flats," where he did his own cooking. During the summer prior to his death he had been in the habit of calling upon his friends in the country south of the city, and during this time he declared to some of his friends that he expected his property to go to his heirs, and had no intention of making a will. There is some testimony of other declarations inconsistent with this. In the latter part of October he became

so bad that he was taken to the residence of his aunt, Jane McKenzie. At this time he had been sick two or three months, and was not in condition to do any work. He could not use his right arm. He was weak, and getting weaker every day, and had the attendance of a doctor nearly every day. He died on the 30th of November.

On the 3d of November proponent called at Mrs. McKenzie's, and took Mr. Parker in his buggy, and conveyed him to his place in the country, some eight miles distant. At this time there was testimony tending to show that he was in such a condition that he had been unable for more than a week to keep anything on his stomach except whisky sling, that he could not eat solid food, and that for a week before he went to Wilson's he had not sat up all day. When Wilson proposed his going, Mrs. McKenzie said that Mr. Parker was very weak, and suggested that it was a long ride out to Wilson's place for so weak a man. Before Wilson took decedent away, he had had the attendance of one Andrew Wright as a nurse, who dressed his arm, put on his clothes, and assisted him up and down stairs. He had also had the attendance of a doctor.

On the 12th of November Wilson brought decedent back to the city, took him to his room in the basement of the Melrose Flats, built a fire, and left decedent there, while he went to find some one to prepare a will. Judge Perkins was found, and visited the room where decedent was, and prepared the will in the presence of Wilson, and it was duly signed and witnessed. Decedent was then taken back to Mrs. McKenzie's. Mr. Wright, his former attendant, was sent for and attended him. He was found in such a weak condition that he had to be carried upstairs, and the nurse remained with him until about midnight. The doctor was also called in. He continued from this time to grow worse, and died on the 30th of November following.

The will bequeathed to the two nieces $200 each. It gave to his aunt, Jane McKenzie, $500. It gave to the proponent, Wilson, $300, to Wilson's wife $200, to Wil-

son's son $100, and to three Huntley children $100 each; the Huntleys being relatives of Wilson. It provided for a monument, at a cost of $100, and made the proponent, Wilson, residuary legatee.

We have not attempted, and shall not attempt, a detailed statement, in this connection, of all the testimony bearing upon the question of decedent's condition. The opportunity for the exercise of undue influence was certainly present, and, taken in connection with the fact that the will was made largely in favor of the proponent, under whose influence decedent was, together with the suspicious fact of his having taken him to this cold room in the basement of the Melrose Flats, instead of returning him to his relative's, and having the will executed there, we think justified the submission of the question of undue influence to the jury. As was said in *Rivard* v. *Rivard*, 109 Mich. 98 (66 N. W. 681, 63 Am. St. Rep. 566):

"Undue influence is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary for the exercise of such control."

It is true that cases may be so clear that, even where opportunity and motive are shown, the court may be justified in withdrawing the question of fact from the consideration of the jury. But we do not find this such a case.

As to the question of mental capacity, Dr. William Clark, who was the attendant of the decedent before he went to the country and after he returned, in answer to the question:

"Then he was in that condition of mind, or body and mind, where he was easily influenced, carried away by the surroundings?" replied:

"Yes, I think he might be influenced.

" *Q.* You give that as your opinion as a physician, and knowing the man?

" *A.* Well, I don't know as it is a medical question, but that is the opinion I have of a man in that condition,

130 MICH.—41.

—he could be influenced by those who were kind to him. I have expressed an opinion in relation to Mr. Parker that his will would have been made in favor of some one else had he been in their charge at the time. * * * I told somebody, shortly after Mr. Parker died, that if Mr. Parker had been at Huntley's, or at any other place instead of Wilson's, they would probably have got his property had they done as Wilson did."

It is true this testimony does not go the length of showing absolute mental incapacity. But there was testimony by other witnesses tending to show a want of mental capacity, if their testimony is held competent. It is contended, however, that some of the testimony offered upon this branch of the case was incompetent. The question as to whether the opinions of the witnesses Woodard, Wright, and London were receivable rests upon whether a proper foundation was laid by a statement of facts within the knowledge of the witnesses respectively. Without reciting at length the testimony of these different witnesses, an examination of the record satisfies us that there was sufficient to justify the court in receiving the opinions of the witnesses. The criticism as to the foundation goes rather to the weight of the testimony than to its admissibility.

The other questions presented do not require discussion. The judgment will be affirmed.

Hooker, C. J., and Moore, J., concurred with Montgomery, J.

Grant, J. (*dissenting*). I think the record in this case is barren of any substantial testimony to justify the verdict of the jury in setting aside the will of Mr. Parker. Mr. Parker was a bachelor, and was under no obligation to his collateral heirs. He, however, remembered them all. He gave his aunt, Mrs. McKenzie, with whom he had lived for a short time, $500; to his two nieces $200 each; to the three Huntleys $100 each; to two others $100 each; to proponent $300; to his wife $200; and to his son $100. He provided $100 for a monument. He knew he

was in debt, and provided for paying his debts. At the time of the trial of this case debts had been proven to the amount of $315. The bequests outside of any members of proponent's family amounted to $1,500, to which add the debts already proved, and we have $1,815. The bequests to the three members of the proponent's family were $600. If, therefore, we take out the expense of administration, the residuary legacy amounts to substantially nothing. It must have been apparent to the testator that his specific bequests, debts, and expenses of administration would include all his property. So far as there being anything unnatural about the provisions of the will, it was very natural for him to dispose of his property as he did. The Wilsons did not get the bulk of his property; on the contrary, they received less than one-third. In the light of these facts, I will now examine the testimony in regard to the execution of the will.

The mere fact that Mr. Parker visited the house of Mr. Wilson for a few days prior to the execution of the will is not alone sufficient proof of undue influence. Mr. Parker and Mr. Wilson were old friends, and the former frequently visited at the latter's. Mrs. McKenzie testified that Mr. Wilson told her that, if she did not think it suitable for Mr. Parker to go out with him, he would not take him; that she replied she had no control over Mr. Parker, and if he thought he was able to go, and wanted to go, it was his business, and not hers. She further testified that the doctor knew he was going. It was not unnatural, under the circumstances, that Mr. Parker should go first to his own rooms. The only evidence in the case is that it was at his own suggestion, in order to get some bedding to take to the house of his aunt, because he said he slept in a cold room; and he said to Mr. Wilson, "While we are there [at his room], why can't I have the papers made out there?" and Mr. Wilson told him he could if he wished. Mr. Wilson built a fire, and then, at the request of Mr. Parker, went for an attorney by the name of Beckwith to draw the will. Mr. Beckwith was busy, and Mr. Wilson

then went to Mr. Perkins, an attorney of reputation, character, and ability. Mr. Wilson came with Mr. Perkins, introduced him to Mr. Parker, and then left the room, and went out to feed his horse. When he returned Mr. Perkins was writing, and he asked if he should go out of the room, and Mr. Perkins replied, "No." In this Mr. Wilson is corroborated by Mr. Perkins, who said that while he was drawing the will Mr. Wilson was in and out of the room. Mr. Perkins relates what occurred as follows:

"Mr. Wilson told him what he had brought me for, and shortly after he went out. I arranged the table for drafting the will, and had a chat with Mr. Parker about his general health and condition, and then I asked him what he wanted to do with his property, how he wanted his will made, and he went on to tell me, and I made a memorandum of the different legacies he desired to make, and, after I had completed it, then I drew off the will in the extended form in which it appears here. When he had got a number of legacies mentioned,—perhaps the fourth or fifth legacy mentioned in the will,—Mr. Parker said, 'Now, how much does that figure up?' and I made a computation and told him how much had been disposed of, and then he made several more,—provided for several more legacies. Then I asked him if he wanted anything done about his monument or stone to mark his grave, and he said he would like to make a provision of that sort; that he would like to have a stone put out in the country cemetery where he was to be laid, and that there should be inscribed upon it also, I think, the name of a brother, who had died before; and he wanted Mr. Wilson named as the executor; and said, also, if there was anything left he would like to have it go to Mr. Wilson. No other suggestion than the one which I have stated was made by me or by any person in relation to the disposal of his property. I found him sitting up when I went there, in a chair. I asked him how he was feeling. He said he didn't have any appetite. He says, 'I think if I could get back my appetite I would be all right; but,' he says, 'as it is, I am feeling rather weak.' He was able to get about. Got up and walked about the room without assistance from anybody, and talked right along in a natural tone of voice. He was not a rapid talker, but still he did not hesitate. I

did not notice anything unusual about his method of talking, and I simply looked upon him as a man who was an invalid.    I am speaking about his appearance.    He appeared to be rational, and fully to understand what he was about.    He had no memorandum at all that he referred to or used to aid him in giving me instructions to draw the will."

In this case, therefore, we have nothing to indicate any undue influence on the part of Mr. Wilson, except the bare fact that he had an opportunity to influence him. He emphatically denies any influence whatever; and the fact that he chose to remember so many of his relatives and friends in his will, giving to his aunt, with whom he was then living, the largest amount, seems to me sufficient to rebut any presumption of undue influence, if the mere fact of opportunity be sufficient to justify such presumption.    I do not think there was any evidence of undue influence to submit to the jury.

Dr. Clark, his physician, who had attended him during his illness, and up to the time of his death, testified as follows:

"I continued to treat him up to the time of his death, November 30th.    I think Mr. Parker was a decided man, —decided in his temperament.    He had his own positive views of business.    His condition was about the same as to clearness of understanding during the time I treated him next prior to his death.    His mind ran in the same channel.    I think he was competent to transact business of any sort.    His mind seemed to be clear up to within 48 hours of his death.    During the 18 days that elapsed between the time that he returned to the house of Mrs. McKenzie and the date of his death, there were two days that I didn't visit him, I think, and there were some other days that I saw him four or five times.    During that time I think his ability was good to understand and recollect the amount of his property, and who were his friends and relatives, and generally to make an intelligent will, according to the amount of information he had, at any time. During the latter part of October, and up to the third of November, when he went out into the country, I saw him almost every day.    Up to the time that I last saw him prior to going out into the country on November 3d, I

think he was competent to make an intelligent will. I did not observe any change or falling off in his mental condition and clearness and strength between the time that I saw him before he went out in the country, November 3d, and the time that I saw him immediately after his return on the 13th. Immediately before and immediately after his return from that stay out in the country, I think his physical condition as to strength was sufficient to attend to the business of making a will."

I do not think the cross-examination of Dr. Clark weakens his testimony in chief. This testimony is as follows:

" *Q.* Well, supposing he was out there with Mr. Wilson for nine or ten days, and in his house there during that time, in the condition he was in, what influence do you think that would have over him in making his will, doctor?

"*A.* I could not say.

" *Q.* Would it not have a tendency to have him make it in favor of those that were around him?

"*A.* It might.

" *Q.* Well, would it not?

"*A.* I think it would.

" *Q.* Then he was in that condition of mind, or body and mind, where he was easily influenced, carried away by the surroundings?

"*A.* His mind was clear.

" *Q.* Well, that is not the question I asked you, doctor. Just read that question again. (Reads.)

"*A.* Yes, I think he might be influenced.

" *Q.* You give that as your opinion as a physician, and knowing the man?

"*A.* Well, I don't know as it is a medical question, but that is the opinion I have of a man in that condition,—he could be influenced by those who were kind to him. I have expressed an opinion in relation to Mr. Parker that his will would have been made in favor of some one else had he been in their charge at the time. I made it off-hand. I said I thought if he had died at Mr. Huntley's that Huntley would have got more, because he would have been under more obligation to Mr. Huntley, because he happened to be there. If he had been over to Mr. Rice's, or Mr. Nellis', or some of those places, he might have favored them. He needed friends very much about that time."

The doctor's offhand opinion in such matters is of but little weight, and has no legitimate tendency to show undue influence on the part of Mr. Wilson. The two witnesses to the will were old acquaintances, knew him well, saw him frequently, and testified that he was perfectly competent to understand it.

The testimony on the part of the contestants in regard to his mental condition is not sufficient, in my judgment, to raise a question of fact as to his competency. Mr. Parker was not an old man. He was, physically considered, enfeebled by disease; but that is not enough to show that a man is incompetent to understand his business or to dispose of his property. He dictated his will without hesitation, and without any *memoranda*, showing a clear and firm mind. The character of the testimony to show that Mr. Parker was incompetent may be illustrated by referring to that of one witness,—Abbie Woodard. She testified that she called at Mr. Wilson's some five or six days after he went there, and had a conversation with Mr. Parker. She said:

"I should call him a good deal different from what he usually was. He was a man that was very lively, and joking and laughing and full of fun generally. He felt well as a general thing, but that time he didn't act as if he— Well, it was either the state of his health or his mind or something, but he didn't act natural to me. I cannot tell. I don't know but it was both. He didn't attempt at all to converse with me when I talked with him. I asked him one or two questions, and he merely answered me, and that in the easiest way he could. I asked him how he was, and he said if he could keep anything on his stomach he thought he would be better, but he could not; and that ended it."

After this testimony the following question was then allowed under objection and exception:

"Was he competent and able to transact any business?
"*A.* Of course, I could not tell, because he did not say anything while I was there. If he had talked with me in any way I might have known whether he was or not, but I

have not— He never had before failed to talk with me when I had seen him. He didn't appear to be able to carry on a conversation that day. I think if he had, he would with me, because I was an old acquaintance of his, and known him for a great many years. I don't think he was able."

Not satisfied with that answer, counsel then put the question :

"From what you talked with him, and the fact that he was not able to carry on a conversation, from what you knew of him and what you saw that day, do you say he was competent to transact business, or make a will disposing of his property, such as he had at that time ?"

The competency of the question was argued by counsel, and finally the objection overruled, and the witness answered :

"Well, of course, not having conversation with him about that— That is, I should think in my own mind that he was not. I should not think he was competent."

I submit that juries ought not to be permitted to set aside wills upon such flimsy and worthless testimony. If it be true he did not talk with her at that time, it is equally true that he was perfectly able to talk when he made his will, and to state to the scrivener, when no one else was present, just what he wanted. If Mr. Parker's will can be set aside upon such testimony, then it would be almost impossible for a person physically enfeebled by sickness to make a valid will, for there is no difficulty in finding persons who are ready and willing to testify to incompetency solely because the testator was ill, and did not talk with or appear to them as he had before. The right to dispose of one's property is too sacred to be thus defeated. The witness Wright testified to nothing to indicate that Mr. Parker's mind was not clear. He was at Mrs. McKenzie's after his return from Wilson's. He testified solely to his physical condition. The witness was then asked, "From what you saw and what you knew of him, whether he was competent to make a will disposing of the property he

had." His answer was, "Well, sir, I don't know what to think of it." Yet he was permitted to go on and give his opinion. Upon what theory can a person be permitted to give his opinion when he says that he does not know? The witness Alice London did not see Mr. Parker until three or four days after his return to Mrs. McKenzie's. The disease was then progressing very rapidly, and his physical condition then is not evidence that he was mentally incompetent four days before. The testimony of these witnesses ought, in my judgment, to have been excluded.

I think the case should be reversed.

LONG, J., did not sit.