ROBERTS v. BIDWELL.

136  191
140  115

1. Wills—Testamentary Capacity—Opinion Evidence.

In the contest of a will for alleged lack of testamentary capac‑ ity of the testator, an opinion of his mental incompetency may be given by a witness testifying to circumstances show‑ ing peculiarities in the conduct of the testator which, taken as a whole, tend to justify the opinion.

2. Trial—Evidence—Hearsay—Sufficiency of Objection.

Where a motion to strike from the answer of a witness a part relating to a conversation had with another as to what a third person told the latter was overruled on a promise to connect it, the ground of the objection was that the testi‑ mony was hearsay, and such it was, and, the promise being unfulfilled, it should have been excluded.

3. Wills—Undue Influence—Evidence—Declarations of Leg‑ atee.

The declarations of one of several legatees or devisees, made in the absence of the testator and prior to the making of the will, are not admissible to show either undue influence or lack of business capacity. *O'Connor* v. *Madison*, 98 Mich. 183, followed.

4. Same—Declarations of Testator.

Declarations of the testator, both before and after the making

of the will, considered, and *held* admissible.  See *Bush* v. *Delano,* 113 Mich. 321.

Error to Lenawee; Chester, J.  Submitted October 20, 1903.  (Docket No. 45.)  Decided March 29, 1904.

H. Brant Roberts presented for probate the last will and testament of Jacob G. Roberts, deceased.  The will was allowed in the probate court, and Charles Bidwell, guardian of Carroll Roberts, an incompetent, appealed to the circuit court.  From a judgment for contestant, proponent brings error.  Reversed.

*Thomas A. Wilson, Watts, Smith & Baldwin,* and *Grant Fellows,* for appellant.

*John E. Bird, Fred B. Wood,* and *John L. O'Mealey,* for appellee.

MOORE, C. J.  This is a will contest.  Jacob G. Roberts, the deceased, was the father of four children, one of whom died when about 13 years old.  The other three grew to manhood.  They were Morris, Carroll, and Brant. Morris died while serving in the army, in the year 1864, never having been married.  Brant, the youngest son, remained at home until he was upwards of 35 years old. He was married in 1877.  Carroll was also married, his wife died, and in 1889 he was adjudged insane and sent to the asylum.  At this time he had children, who are still living.

On March 6, 1895, Mr. Roberts went to Adrian, and had Mr. Weaver draw his will.  It provided for the payment of his debts and funeral expenses.  It gave "to the trustees of the Presbyterian church of Tecumseh, and their successors in office, the sum of $400, to be by them invested, and the income thereof, annually thereafter, shall by them be paid to the minister in charge, to the end that my children and grandchildren may have the benefit of said church."  It gave to his niece the sum of $200.  It

provided for the erection on a lot owned by Carroll of a suitable monument for the use and benefit of Carroll, the cost not to exceed the sum of $600. It gave to his granddaughter certain articles of household furniture. It then provided "in case my son Carroll Roberts comes into possession of all of his faculties and is restored to his full reason on or before the date of my death, and is living at that date, then and in such case I hereby direct my executors to set aside and invest the sum of $2,000, and the income thereof they shall, annually thereafter, pay to the said Carroll Roberts for and during the period of his natural life, and on the death of said Carroll the said principal sum of $2,000 shall be paid by said executors to my son H. Brant Roberts, or his heirs." And it gave all the rest of his property to his son H. Brant Roberts.

Mr. Roberts died in October, 1900, when 88 years of age, leaving this will still unrevoked. It was offered for probate and admitted. An appeal was taken to the circuit court. The case was tried before a jury, who disallowed the will. The proponent has brought the case here by writ of error.

Counsel for appellant group the assignments of error as follows: "(1) Questions relating to the admissibility of evidence generally; (2) statements of the testator; (3) the proponent's requests, and the charge of the court as given."

It is claimed the court erred in allowing witnesses to testify to their opinion of the mental incapacity of the testator, without showing they were sufficiently acquainted with him to be able to form an opinion; citing *White* v. *Bailey*, 10 Mich. 155; *O'Connor* v. *Madison*, 98 Mich. 183 (57 N. W. 105); and *Page* v. *Beach*, 134 Mich. 51 (95 N. W. 981). Counsel call attention particularly to the testimony of the witnesses Heck, Loven, and Haight. It will be sufficient to state the substance of what the record shows as to the acquaintance of one of these witnesses, as illustrative of all of them. Mr. Haight testified:

" Before that I lived in the township of Tecumseh about twenty four or five years. I am well acquainted with the people about there, and knew Jacob G. Roberts. When Jacob G. Roberts was Jacob G. Roberts, he was a strong, vigorous man, both mentally and bodily. I moved away from Tecumseh the year of the World's Fair, in the year 1893. I noticed a change in Mr. Roberts mentally before I went away.

" *Q.* Well, now, just relate to the jury some things that you saw, Mr. Haight.

"*A.* Well, I used to see him go past my house. That was the street he used to take every time he went to town and home; and prior to this time he used to go by quiet, and the last year or so that I lived there he went by a great many times noisy, singing and talking to himself, making those kind of demonstrations. Once when he went by, he lifted up his coat and brought out a lot of mail, and says, ' I have got my mail today.' I had said nothing to him about his mail or anything else. No one else asked him about his mail. I have seen him go by there in very hot weather with a big overcoat on, and a muffler around his neck, a big, heavy buffalo robe over his lap, and fur gloves on, and side curtains on his buggy. Maybe he was sick,—I don't know,—but he went by in that way. He came by on one occasion and accosted me while I was playing croquet. I was playing croquet with some friends in the yard in front of the house, and he wanted to sell me a horse. He had a colt he wanted to sell,—a young horse that he had just been getting. I told him I hadn't any use for a horse, and I didn't want to buy any. He said he had just bought the colt, and he would like to sell it. He said the colt was the one that he had hitched to his buggy. As a matter of fact, he had an old horse hitched to his buggy, that he had driven for 14 or 15 years. He said he had bought the colt from Mr. Clarkson, and paid $150 for it.

" *Q.* During that last year, Mr. Haight, before you moved away from Tecumseh, from what you saw of him and what you talked with him, is it your judgment that he was mentally competent to transact any business of importance?

"*A.* Why, not generally, I shouldn't suppose he would be. While I lived in Tecumseh, Mr. Roberts had to pass my house in going to and from his home to Tecumseh."

On cross-examination, witness testified that he was never intimate with Mr. Roberts.

"Never had any conversation with him, except to pass the time of day. He lived a mile and one-half from me. I left the farm in March, 1893, and moved farther away from him. After that I hardly ever saw him. There was no one in the carriage with him when I heard him talking. I didn't observe whether there was any one along the road, but didn't think he addressed his conversation to any one in particular. I don't know whether the old gentleman was sick, or not, when he was bundled up."

Redirect examination:

"After I moved down in Raisin,—can't say whether it was in 1897 or not,—Mr. Roberts asked me where Daniel Waring lived. At that time Daniel Waring was dead,—had been for several years."

On recross-examination, witness testified that this last conversation might have been at the time of the guardianship proceedings. "I have no recollection of ever having any conversation with Mr. Roberts."

This witness showed as little acquaintance as any of those permitted to be witnesses.

In *Prentis* v. *Bates*, 93 Mich. 234 (53 N. W. 153, 17 L. R. A. 494), Justice MONTGOMERY, speaking for the court, said:

"It was competent to show by witnesses that decedent was erratic, eccentric, rambling and disconnected in her conversation, flighty in her notions, unsettled; that her manner was excitable; that she could not comprehend connected conversation; that she ran about the house screaming, with her dress open in the front, etc. These circumstances, of themselves, might not have been sufficient to show testamentary incapacity, but they were competent to be considered with the other evidence offered in the case for that purpose. It cannot be contended in this case that there was not enough testimony to justify submitting to the jury the question of mental incapacity, and, where this is the case, circumstances are often admissible which may coexist with a perfectly sound mind. It seldom occurs that any one circumstance or act of a party will, of itself, show insanity. On the contrary, the judgment of his acquaintances, as well as of medical experts, must be, and is, made up from circumstances and acts

trivial in themselves, but which, when considered together, carry conviction of mental unsoundness. Reference is made to the case of *Fraser* v. *Jennison,* 42 Mich. 206 (3 N. W. 882), and language may be found in the opinion of the court in that case which apparently gives some support to the contention of proponents. But we think this court has never evinced the purpose of creating one rule of evidence which shall apply in will cases, but which is not to be adopted in any other. It is much better than that any such incongruity should become ingrafted in our law, that it be left to the trial judge to guard carefully the rights of legatees by full and adequate instructions upon the degree of mental competency requisite to make a valid will, accompanied by any necessary caution against giving undue weight to circumstances which, while more consistent with insanity than sanity, yet may coexist with either condition of mind. If it be the rule, as this court has repeatedly held, that inferences from proven facts are to be drawn by the jury, and not by the court, it follows that, in making proof of mental incompetency, any fact which is more consistent with that theory than with the theory of mental soundness must be admissible, and the duty of drawing an inference therefrom is one which an appellate court should not undertake, but which rests with the jury impaneled in the trial court."

In *O'Connor* v. *Madison,* 98 Mich. 183 (57 N. W. 105), Justice Hooker, speaking for the court, said:

"It is the settled law of Michigan that an opinion that a testator was incompetent can only be given when the witness has testified to circumstances upon which it is predicated, and which to some extent justify it. *White* v. *Bailey,* 10 Mich. 161; *Beaubien* v. *Cicotte,* 12 Mich. 459; *Rice* v. *Rice,* 50 Mich. 448 (15 N. W. 545); *Kempsey* v. *McGinniss,* 21 Mich. 123; *Prentis* v. *Bates,* 88 Mich. 567 (50 N. W. 637); *Id.,* 93 Mich. 234 (53 N. W. 153, 17 L. R. A. 494). The extent to which such proof must go cannot be limited by an inflexible rule. It must depend upon the familiarity of the witness with the testator, the character of the disqualification, the nature and number of extraordinary circumstances detailed, and proximity to the act involved in point of time. Taken as a whole, they should move the judicial discretion of the trial judge, by apprising him that the witness may fairly doubt

the competency of the person upon .reasonable grounds.
*Prentis* v. *Bates,* 93 Mich. 242 (53 N. W. 153, 17 L. R.
A. 494); *Lynch* v. *Doran,* 95 Mich. 395 (54 N. W. 882).
And this discretion must be carefully exercised. *Rice* v.
*Rice,* 53 Mich. 432 (19 N. W. 132).''

See, also, *Rivard* v. *Rivard,* 109 Mich. 98 (66 N. W.
681, 63 Am. St. Rep. 566); *Sullivan* v. *Foley,* 112 Mich.
1 (70 N. W. 322); *Lamb* v. *Lippincott,* 115 Mich. 611
(73 N. W. 887); *People* v. *Casey,* 124 Mich. 279 (82 N.
W. 883); *Walts* v. *Walts,* 127 Mich. 607 (86 N. W. 1030).

The testimony of this witness was supplemented by
testimony of other witnesses tending to show much more
marked eccentricities, and that they continued from 1893,
and increased until the time of the death of Mr. Roberts.
We think a sufficient showing was made to permit the
testimony.

Mrs. Thurlbee was a witness on the part of the con-
testant. She had worked for Mr. Roberts, and after her
marriage she and her husband worked the Roberts farm.
Among other things, she testified as follows:

" Lynn Roberts, Carroll's son, followed us on the farm.
Recollect an occurrence which took place in February,
just before we left. Lynn came to the house, and said he
wanted I should board the men. He wanted to put up
some ice. Said he would come down with three teams the
next day. And I told him I would. And he said, 'Well,
don't say anything to grandpa about it, for I met Uncle
Brant up the road, and he told me not to say anything to
grandpa about it, but to go on and do what I was a mind
to, and he would stand by me.'

"*Mr. Fellows:* I move to strike this out, as what Lynn
told.

"*Mr. Bird:* We propose to connect it.

"*The Court:* You may take the answer. (Exception
for proponent.)

"The next morning, after I had done my work, and I
was sitting in my room— Mr. Roberts was hard of hear-
ing, and I heard Brant say to him, 'Have the boys come
yet to put up the ice?' The old gentleman didn't under-
stand, and Brant repeated the question, and the old gentle-
man says, 'Why, they ain't going to put up ice.' Brant

said, ' I saw Lynn up the road yesterday, and he said they were coming to put up ice.' The old gentleman says, 'He was here, and he didn't say a word to me about it.' Brant says, ' Well, I told you that would be just the way he would do. I told you he would do just as he had a mind to.' The old gentleman says, ' We will see whether he does or not;' and after this, within half an hour, the boys came with the teams, but they didn't put the ice up. The old man wouldn't let them."

Brant's version of this incident was as follows:

" While Lynn was on the farm, he came over and said he wanted to put some ice up, and my father objected, or he thought he would object; but, if I remember right, my father did not object or raise any objection, and I told Lynn that, if I wanted to put up ice, I would go ahead and put it up. He had all the expenses to pay, and he put it up himself. I have no recollection of my father's raising any objection. I did not use the expression to any one that ' I told you that would be the way of it.' "

It is now said Mrs. Thurlbee should not have been allowed to testify to what Lynn said his uncle Brant told him, for the reason that it was hearsay. On the other hand, it is said the objection was not put upon the ground of hearsay. We cannot agree with this claim, but think it was the ground of the objection, and that the promise to connect the testimony with Brant Roberts, making what Lynn said Brant told him admissible, was not fulfilled, and the testimony of what Lynn said his uncle Brant told him should have been excluded.

Eugene Smith, a former tenant of Mr. Roberts, was a witness, and was questioned about a conversation he had with Brant Roberts about a year and a half before the will was made. The court was in doubt about the admission of this testimony; but counsel were insistent, claiming it had a bearing upon the question of undue influence, and the court admitted it for that purpose. This conversation was at a time when Jacob G. Roberts was not present, and did not relate to the making of the will. If it had any value as testimony, it was because it was in the nature

of an admission on the part of Brant that his father was not capable of doing business in the absence of Brant. It will be remembered that there are other legatees than Brant. A like question was before this court in *O'Connor* v. *Madison*, 98 Mich. 183 (57 N. W. 105), where it was held the testimony was inadmissible. This case was followed in *Re Estate of Lefevre*, 102 Mich. 568 (61 N. W. 3). See, also, *In re Ames*, 51 Iowa, 596 (2 N. W. 408); *Thompson* v. *Thompson*, 13 Ohio St. 356; *Forney* v. *Ferrell*, 4 W. Va. 729.

It is said the court erred in admitting testimony of what was said by the testator both before and after making the will. We think this testimony was admissible under *Harring* v. *Allen*, 25 Mich. 505; *Pierce* v. *Pierce*, 38 Mich. 412; *Haines* v. *Hayden*, 95 Mich. 332 (54 N. W. 911, 35 Am. St. Rep. 566); *Rivard* v. *Rivard*, 109 Mich. 98 (66 N. W. 681, 63 Am. St. Rep. 566); *Bush* v. *Delano*, 113 Mich. 321 (71 N. W. 628).

It is insisted the court should have directed a verdict in favor of the proponent upon both branches of the case. We cannot agree with counsel in this contention, but think there was testimony which, if believed, would justify the setting aside of this will.

The other assignments of error have been considered. We do not need to discuss them, further than to say they are either not well taken or are not likely to occur again.

Judgment is reversed, and new trial ordered.

CARPENTER, MONTGOMERY, and HOOKER, JJ., concurred. GRANT, J., took no part in the decision.