*In re* HEWITT'S ESTATE.

WARNER *v.* DYER.

EVIDENCE—WILLS—ESTATES OF DECEDENTS—ADMISSIONS—UNDUE INFLUENCE.

Admissions made by a legatee who is not a party to proceedings for the probate of a will, tending to show an intent on her part to exercise undue influence over the mind of testator, are incompetent where there are also other legatees under the testament who took no part in the alleged undue influence.

Error to Allegan; Padgham, J. Submitted April 8, 1910. (Docket No. 34.) Decided June 6, 1910.

William W. Warner, as executor, presented for probate the last will and testament of George Hewitt, deceased. The will was allowed in the probate court, and Elizabeth Dyer and Charles W. Hewitt, contestants, appealed to the circuit court. A judgment for contestants is reviewed by proponent on writ of error. Reversed.

*Charles Thew* and *O. S. Cross*, for appellant.

*Wilkes & Stone*, for appellees.

STONE, J. This case presents a contest over the will of George Hewitt, deceased. The will was allowed in the probate court, and Elizabeth Dyer and Charles W. Hewitt, a daughter and son of deceased, appealed to the circuit court, where contestants prevailed. The will was contested in the circuit court on the grounds of mental incapacity and undue influence.

The testator died December 21, 1907. On February 22, 1907, he made the will in question, leaving one-half of his estate to one Jennie Flitcroft, a woman with whom he had lived, and who had cared for him during the last three years of his life, and the other half to Fanny Miller, his daughter, during her lifetime, and at her death to her six grandchildren, who are named in the will. Mrs. Miller joined in the effort to defeat this will, but she was not a party of record. The grandchildren were not parties, and were not represented at the trial, in so far as this record shows. At the time of his death the testator was 89 years of age. He was an uneducated man, and could neither read nor write. He came from England to the State of New York when the older children were small. After his wife's death, he came to Allegan, Mich., and spent the remainder of his life at or near that place. He brought with him to Michigan his son Thomas, who has since died. He left in New York the son Charles, then

an infant, and at least two daughters, the oldest children. About nine years later, when Elizabeth, the oldest child, one of the contestants, was 20 years old, she came to Michigan, and for a time kept house for her father and brother, and afterwards, and after some trouble with her father, she married Russell Dyer. In 1875 testator married a second wife, and moved upon a farm, and lived with her until she died in 1897, after which a Mrs. Crow kept house for him until her death in 1903. Elizabeth and her husband lived with him on the farm for about 11 months, ending in April, 1904. During this time he visited the daughter Fanny and her children in Kansas. From April, 1904, he lived on the farm alone. In November, 1904, he went to the Flitcrofts' and remained there until his death. After he came to Michigan, the first time testator saw his son Charles was some 16 years ago, when he was visited by him, and Charles visited him twice afterwards. He remained a short time only. Elizabeth has lived in Allegan and vicinity most of the time since she came there, save nine years in northern Michigan. The first time testator saw the daughter Fanny was about 26 years after he came to Michigan, and she has visited him twice since. She and her daughters live in Kansas.

It is claimed by proponents that there never existed any filial affection on the part of the children toward the testator, nor any parental affection on his part toward them; that his relations with Elizabeth were cold, and, while she visited him occasionally, he always showed a distinct dislike to her husband and their son, and while and since they lived with him upon his farm, a dislike toward Elizabeth. He made complaint to his friends, while the Dyers were on the farm, that they did not care for him and neglected him when he was sick, and said he would not live with them again, that he had no use for them, and that Elizabeth should never receive anything from him. Charles in his last visit to testator obtained $30 from him in a way which he considered dishonest. He never ex-

hibited any affection for Charles, and was heard to say that he should never receive any of his property.

During the summer and fall of 1904 Mrs. Flitcroft did the baking and washing for testator, and cleaned his house occasionally, he promising to compensate her for this, and in the fall he went to live with the Flitcrofts. At that time, and for some time afterwards, he was afflicted with sores and rheumatism, and had the grip and bowel trouble. There is no question that Mrs. Flitcroft attended him and nursed him, and gave him excellent care. In October, 1905, testator sold the farm for $3,000. During 1906, and until after the will was made, testator's health had improved and was good for a man of his age, and he was able to get about and showed great physical vigor. He was a man of strong will and stubborn disposition. He habitually used intoxicating liquors, but generally not to excess. At the time Mrs. Crow died there was a will of testator in existence, and it was destroyed. It gave Mrs. Crow a lot called the brewery lot, a cow, the household furniture, and an equal share in the balance of testator's estate with his daughters, Mrs. Dyer and Mrs. Miller, and son Charles. In 1905 he made another will, in which he left Mrs. Dyer and Charles out entirely, gave $500 to Mrs. Flitcroft, and the balance to his daughter Mrs. Miller. He paid no board to the Flitcrofts as such, but aided Mrs. Flitcroft in building a brick house to the amount of upwards of $300, gave her a cow and some other articles, and, in the spring of 1907, $150, and, just before he died, $50. William W. Warner, one of the executors of the will, proposed it for probate.

Upon the trial of the case counsel for proponent took numerous exceptions to the rulings of the trial court in the introduction of evidence, and there are 49 assignments of error in the record. We shall not discuss all of these assignments, for the reason that, as the case must go back for a new trial, many of the questions argued are not likely to arise again.

We have read this record carefully, and are of opinion

that there was no evidence of want of testamentary capacity on the part of the testator, and that proponents' twelfth request should have been given.   We should hesitate to reverse the case were this the only point, for the reason that we are strongly impressed by the charge, and in fact by the entire record, that the jury found against the will on the ground of undue influence, although both questions were submitted to them.

The questions raised by the second, seventh, and ninth assignments of error, relating to the testimony of the witnesses Clara Hess and Elizabeth Shank as to the statements and declarations of Mrs. Flitcroft, against the objections and exceptions of proponents' counsel, present the most serious point in the case.   When it is borne in mind that Mrs. Flitcroft was not one of the proponents of the will, was not a party to the record, and that she is only one of a number of legatees, and that her interest is distinct from that of the legatees, the grandchildren, the error of admitting this testimony is made clear.   The testimony referred to is as follows:

Clara Hess, a witness for contestants:

"I moved from Allegan about 1½ weeks before Mr. Hewitt died.   He was sick when we left and had been for about a week.   We had a phone which Mrs. Flitcroft used sometimes for the doctor, and some to order feed, and while using the phone for the doctor she would tell about Hewitt being sick, and didn't want the Dyers to know it, and for me not to tell them ; that she didn't care how soon he died, and, if he died tomorrow, she knew what she was worth. She said this on more than one occasion. She said it every time she phoned for the doctor.   This was during the first week he was sick.   I think it was the 12th or 13th of December that we moved away.

"Q. Did you say anything to Mrs. Flitcroft when she made those remarks about the Dyers ?

"Mr. Thew: Object as incompetent and immaterial.

"The Court: Give the whole conversation.

"Mr. Thew: Note an exception.

"A. I told her that it was none of my business, but that I thought the Dyers ought to know, as they were his

children, and Mrs. Flitcroft said that Hewitt didn't like them and didn't want them to know it.   I often asked her if she didn't get board for Hewitt, but she never answered me.   The brick house was built before I moved to that neighborhood.   Mrs. Flitcroft told me Hewitt built it on her lot.   She said Hewitt got letters from his daughter.

"*Q.* What did she say about reading those letters to him?

"*Mr. Thew:* Object as incompetent, without laying foundation for it.

"*Mr. Wilkes:* This is not impeaching testimony.   My opening discloses its purpose.

"*The Court:* She is a party here, anyway.   Go on.

"*Mr. Thew:* Note an exception.

"*A.* She said she read the letters to him, and read what she wanted to in them, and left out what she wanted to.   These letters were from his daughter Mrs. Miller who lived in Kansas.   She didn't say what she would put in or what she would leave out."

Elizabeth Shank, a witness for contestants:

"*Q.* Did you have any talk with Mrs. Flitcroft relative to her taking care of Hewitt?

"*Mr. Thew:* We object, and claim that any conversation of that kind ought to have a foundation laid for it, that it is an impeaching matter, and I wish to object to this, and have this objection stand to others of the same kind without interrupting the court right along.

"*Mr. Stone:* It is offered as direct testimony bearing upon the question of undue influence.

"*The Court:* Take your exception, and go on.

"*A.* I kept house for John Knowlton for four years, from 1901 till the fall of 1904.

"*Q.* As to whether or not you acted as nurse for Mr. Knowlton?

"*Mr. Thew:* Objected to as incompetent and immaterial.

"*The Court:* Go ahead.

"*Mr. Stone:* The relevancy will appear soon, because it was about Knowlton the talk started.

"*Mr. Thew:* Take an exception.

"*A.* Yes, he lived across the street from where I live now.

"*Q.* How did you get your pay from Knowlton?

"*Mr. Thew:* Objected to as incompetent and immaterial.

542 161 Michigan Reports. [June

"*A.* I got my pay every month.

"*Mr. Thew:* Wait until the judge decides this.

"*The Court:* Go on.

"*Mr. Thew:* Note an exception.

"*A.* The way I first became acquainted with Mrs. Flitcroft was that when I worked for Knowlton I rode in Flitcroft's hack, and Knowlton, when he was going out of town, I would go to Flitcroft's and order the hack for him. Sometimes Mrs. Flitcroft drove, and sometimes she rode in the hack when I did.

"*Q.* Did you have a talk with Mrs. Flitcroft relative to what you received for taking care of Knowlton?

"*Mr. Thew:* Object.

"*The Court:* She may answer.

"*Mr. Thew:* Take an exception.

"*A.* While Hewitt was living at Flitcroft's, I bought milk of Mrs. Flitcroft, and went there after it, and I asked her if Hewitt had sold his farm. She said he had, and that they had coaxed him to sell it and come and live with them, where he could have care, and that he was alone there. The only thing I can remember about her saying anything about pay was: 'I am not going to be like you was with Uncle John (meaning Knowlton). He always said he would give you that house and lot when he was through with it, but he didn't, and I am going to know what I am going to get from Hewitt. I am going to keep a book and put everything down that he has, and that I do for him, and, if I don't get anything else, I will have a good big board bill.' That Mr. Hewitt had $2,000 or $3,000, and she was going to coax him to make it over to her, and, if he did, she would be satisfied. I said to her that it seems strange his daughter, Mr. and Mrs. Dyer, living there, that they didn't see to it that he didn't give his property away, and she said he had a right to give it to who he had a mind to, and that 'Dyers will never get anything if I can help it, and I can, because Grandpa thinks the world of me, and I can coax him to do anything. I hate old Russ Dyer.' She said she wrote all of Grandpa's letters, and, when he received any, she read them to him, and put in a good word for herself. The letters he received from his daughter, Mrs. Miller, she said that while reading them, every little while, she would say: 'Now, father, when you make your will, be sure and remember the good woman who is taking care of you.' Then she would read a little further, and then she would repeat that two or three times.

"*Mr. Thew:* This is all under the same objection and exception; and, further, the letters would be better evidence.

"*Witness:* She said Fish was his lawyer one time when I saw her, and that Hewitt had told her he had made the money over to her, and that she was going to ask Fish, and, when I saw her again, she said she had asked Fish, and he wouldn't tell her, and that she had coaxed Hewitt to take his business away from Fish and give it to Warner, which Hewitt had done. She had asked Warner, and Warner had told her not to worry, that she was well provided for. She told me that Hewitt had given her a cow and calf, some carpets or rugs, and a lot of other things, and showed me a $45 range, and said that Grandpa gave it to her. Once she told me Grandpa drank gin. One time she looked sick, and when I asked her about it, she said she had been awful sick, and said: 'If that old devil lives much longer, I shall die. I can't do a thing with him unless he has his bitters, and I try to keep his bottle full.'"

This is a part only, but a fair sample, of the testimony of this witness. That this testimony had weight with the jury is rendered probable by the charge of the court upon this subject. It was as follows:

"The jury have a right to consider whether or not Mrs. Flitcroft expressed to others an intention to poison the mind of Mr. Hewitt against the Dyers, and whether she said that she was going to try to get the property for herself, and prevent them from obtaining it, whether she read into the letters received by Mr. Hewitt things in her own favor that were not contained in these letters, because, while this evidence might not of itself prove undue influence, it might tend to prove, if believed by the jury, a desire and willingness on the part of Mrs. Flitcroft to practice fraud and deceit in her dealings with Mr. Hewitt for the purpose of obtaining an influence over his will and mind, and for the purpose of fraudulently causing him to dispose of his property in her favor; and the jury would have a right to consider all this evidence bearing upon the question as to whether or not undue influence was actually exercised by Mrs. Flitcroft over Mr. Hewitt."

In *O'Connor* v. *Madison*, 98 Mich. 183 (57 N. W. 105), it was distinctly held by this court that the rule admitting

the declarations of a sole devisee as competent evidence to prove undue influence does not extend to cases where there are several devisees or legatees, and many cases are there cited in support of the rule. The above case has been cited and expressly approved in the following cases : *In re Estate of Lefevre*, 102 Mich. 568 (61 N. W. 3); *Bean* v. *Bean*, 144 Mich. 599 (108 N. W. 369). It is the claim of contestants' counsel that this rule was departed from in the recent case of *In re Loree's Estate*, 158 Mich. 372 (122 N. W. 623). This case is clearly distinguishable. An examination of it will show that Mrs. Loree, the widow, was the proponent ·of the will, and therefore a party to the suit, and her statements were admissible in evidence. The clear weight of authority in other States is in accord with *O'Connor* v. *Madison, supra.* See 29 Am. & Eng. Enc. Law (2d Ed.), 119, and cases cited in notes; *Matter of Ames*, 51 Iowa, 596 (2 N. W. 408); *Smith* v. *Henline*, 174 Ill. 184 (51 N. E. 227); *Shailer* v. *Bumstead*, 99 Mass. 112, 127; *Schierbaum* v. *Schemme*, 157 Mo. 1 (57 S. W. 526, 80 Am. St. Rep. 604). In this last case the authorities are reviewed at length.

For the errors pointed out, the judgment below will be reversed, with costs, and a new trial ordered.

MOORE, McALVAY, BROOKE, and BLAIR, JJ., concurred.