*In re* HOYLES' ESTATE.

1. EVIDENCE—EXPERT AND OPINION TESTIMONY—INCOMPETENCY—
   WILLS.

   An opinion that a testatrix was incompetent, in proceedings
   for the probate of a will, may only be given after the wit-
   ness has testified to circumstances upon which it is predi-
   cated and which tend to justify his conclusion.

2. SAME—WILLS—OPINIONS.

   A physician who attended deceased at intervals up to three
   days before she executed her will, and who saw her a few
   days after, who testified that she had locomotor ataxia, that
   she was nearly blind, and was helpless, that the disease had
   produced physical and mental debility, and stated other cir-
   cumstances relating to her appearance and condition, is
   sufficiently qualified to express an opinion as to her compe-
   tency to transact business.

3. WILLS—COMPETENCY—BURDEN OF PROOF.

   In a case where the evidence is conflicting as to competency
   of the testatrix, and the trial court has denied a new trial,
   and the burden of proof is on the defeated party, a verdict
   will not be set aside as contrary to the weight of the evi-
   dence, unless the case is a very clear one affording strong
   evidence that the jury was biased or prejudiced.

Error to Lapeer; Smith, J. Submitted June 9, 1910.
(Docket No. 37.) Decided July 14, 1910.

Samuel Hoyles presented for probate the last will and
testament of Euretta A. Hoyles, deceased. The will was
allowed in probate court, and Elizabeth Briggs and an-
other, contestants, appealed to the circuit court. A judg-
ment for contestants is reviewed by proponent on writ of
error. Affirmed.

*Geer, Williams & Halpin*, for appellant.
*William E. Brown*, for appellees.

STONE, J. The question in this case was upon the validity of the paper claimed by Samuel Hoyles, the appellant and proponent, as the last will and testament of Euretta A. Hoyles, deceased. The instrument was admitted to probate in the probate court, and contestants, two sisters of testatrix, appealed to, and prevailed in, the circuit court. The proponent has brought error. The main ground upon which the validity of the paper was assailed was that, at the time it was drawn and executed, the testatrix was not of sound and disposing mind and memory; but that her mental faculties were so enfeebled and overcome by disease as to render her incapable of properly understanding her relations to others, their relative claims upon her bounty, the particulars of her property, and the nature of the disposition made by the instrument. The following statement of facts is compiled from proponent's brief:

The testatrix, a single woman, died July 6, 1906, at the home of William Osborne in Lapeer county, aged about 52 years. The will in question was executed June 19, 1906. Miss Hoyles' father died when she was about two years old, and shortly after his death she was taken into the family of Samuel Hoyles of Aurora, Ill.; her mother being in poor circumstances. She was not legally adopted by him, but was raised by Samuel Hoyles and his wife as their own child, and lived in their family until she was 38 years old. They had no children, and Euretta did not know that she was not their child until she was 16 years old. She received her early education in the public schools of Aurora, and taught there and in a seminary for more than 20 years. She then went to the University of Michigan, where she graduated, and in the same year went to Lapeer as principal of the high school, which position she held for five years, during which time the children of William Osborne were her pupils. She then went to the Philippines as a government teacher, and remained there three years. The climate there proving injurious to her health, she returned

to the United States in the fall of 1904. She landed in New York, and went from there to Aurora, stopping a few days in Lapeer on her way. Her foster mother had died in the meantime, and she spent the winter in Aurora, boarding at the same place where Mr. Hoyles made his home. The plan was that she and Mr. Hoyles should thereafter live together. When she was a student at Ann Arbor, Mr. Hoyles visited her there, and, during one or more of the summer vacations, took apartments where they spent the summer together. He also visited her while she was teaching in Lapeer. In the spring of 1905 she was afflicted with a nervous disease called "locomotor ataxia." She had become weak and emaciated, and went to a sanitarium at Castile, N. Y., hoping to be benefited, and intending to return to Aurora. She soon became satisfied that she could not be benefited by the treatment at the sanitarium, and she wrote to a niece living not far from there, proposing to go and spend some time there. Not hearing from her after waiting a few days, she started home to Aurora. She stopped at Lapeer to visit friends. She went into the country to spend a few days at the farm home of Mr. Osborne, and, believing that the conditions there would prove beneficial to her health, she arranged with the Osborne family to permit her to make a more protracted stay. She then sought to have Mr. Hoyles come there to be with her; but the condition of his health would not permit, and he was not able to go until June 15, 1906, about a year after Miss Hoyles went to live with the Osbornes. Soon after he arrived, she asked him to draw her will. He suggested that this could better be done by a lawyer, but finally drew it for her June 19th, and it was witnessed by Mr. Osborne and his son. During the year she was at Osborne's she required a good deal of care, being unable to dress herself, and this, and many more unpleasant duties, were discharged by Mrs. Osborne. Miss Hoyles paid $3 a week for her board and also for washings. Her estate consisted of about $1,000, nearly all in money. By the terms of the alleged will,

Mr. Hoyles was to have $300, and there were other small bequests to his relatives aggregating $125, and $50 to the daughter of Mr. Osborne. Her trunk of clothing was to go to her sister, Mrs. Briggs, one of the contestants, and Mrs. Osborne was made residuary legatee.

Miss Hoyles had executed a prior alleged will on April 27, 1906, at the home of Dr. Blake at Lapeer, in and by which she had given Mr. Hoyles $100, Mrs. Cora Hoyles $25, Mrs. Osborne $50, and the balance to be equally divided between her two sisters, the contestants, after taking out $25 for each of her three nieces, and $50 for a monument; and some gifts of personal effects to friends were made. It was the claim of proponent's counsel on the trial at the circuit court, that there was no evidence in the case that would warrant the jury in finding a verdict against the will of June 19th, and they asked the court to direct a verdict, which it refused. A motion for a new trial was made on the ground that the testimony of the only witness for the contestants was incompetent, and that the verdict was contrary to the weight of evidence. The motion was denied, and by exceptions and assignments of error the said questions have been raised and argued.

Dr. William Blake was the principal witness for the contestants, and it is the claim of the proponent that his testimony, as to the mental condition of Miss Hoyles, was incompetent, for the reason that he did not testify to any facts or circumstances that would sustain the opinion he expressed. We shall not undertake to give all the testimony of Dr. Blake which is contained in this record, but enough to indicate the nature and trend of it. He testified: That he had lived in the city of Lapeer 18 years. Was a physician, and had been in the practice of medicine for over 30 years. That he knew Miss Hoyles in her lifetime, and knew her during the five years in which she taught school at Lapeer, and that she had been a frequent visitor at his home. That she had visited his home after her return from the Philippines in the fall of 1904. That

members of his family corresponded with her while she was in the Philippines. That by invitation she was present at the marriage of his daughter in June, 1905, and remained some days, probably a couple of weeks, in the family as a guest. That when she returned from the Philippines he observed she was in a very poor condition, suffering from nervous trouble. That she was very weak and debilitated, and very thin in flesh. That she stayed a few days upon her return from the Philippines and then went to Aurora. In June, 1905, he noticed she was in very poor health. That especially the nervous disease was then progressing. That she was then afflicted with locomotor ataxia. That she went to a sanitarium in the State of New York, for a time, in the spring of 1905, returning to his house in June, and was there a few days off and on, and that soon after she went to Mr. Osborne's to live. That he saw her frequently, and observed that the nervous trouble was gradually growing worse, so that at times she was not able to get up or arise from a chair, and when she did so she staggered. That she had paid a visit to him and his family in the month of April, 1906, was there some two or three days, and that while there, on the 27th of April, his wife, at her request, prepared the will of that date. He further testified that he saw her the last Sunday previous to her death, and the Sunday before that. That she died July 6th. Also that he saw her about the middle of June. He had not been her physician, but in the fall of 1905 had treated her for an ulcer upon her foot. The relations between herself and his family had been very close. That she had issued two small volumes of poems, and that one of these books was dedicated to his wife. These friendly relations continued. During the second Sunday before she died, he saw her, and he testified that she was so nearly prostrated that she could not see distinctly. She could only talk in whispers. That her condition continued to grow worse, and on the second Sunday he thought she was totally blind, and that the disease from which she suffered is one that leads to the

deterioration of the nerves. That the nerves become hard and deteriorated, and that the optic nerve becomes affected, and that persons frequently become blind before death with this disease. That the physical condition becomes weak and debilitated, and that the brain suffers with the rest of the body. That the brain is the center of the nervous system. That this particular disease is affecting to the nerves of the trunk and spine, leads to great inanition, loss of flesh, muscles become hard and weak, and the digestion is affected; and, in fact, the whole system is broken up, and with it the brain becomes weak and feeble. That he saw Miss Hoyles at Mr. Osborne's on the 16th day of June, three days before the will in question was drawn. He took Mr. Hoyles up there and left him. He noticed that she had been failing very rapidly since he last saw her. That she was becoming weaker and more debilitated in the way of helping herself, and by loss of flesh she had become a mere skeleton. In fact, her face was drawn, mere skin and bones, and presented a skeleton-like appearance.

After giving testimony of this nature, Dr. Blake was asked the following questions:

"*Q.* From the progress of the disease and the condition you saw her in that day you have described, what would you say about her being able to remember her relatives or beneficiaries at that time without prompting?"

Under objection and exception he answered:

"*A.* I think she could not remember.
"*Q.* What would you say with reference to her being able to remember all of her affairs and property interests?
"*A.* I think she could not remember.
"*Q.* Doctor, was she in a mental and physical condition to transact any business requiring exercise of the judgment or reasoning faculties and the consecutive continuation of thought?
"*A.* No, she was not."

Upon cross-examination Dr. Blake testified that he never heard her say or do anything that would show she

was not mentally competent, but he judged of her condition from her general appearance and the recognized progress of the disease.  He testified that he thought she would not be able to call to mind friends or property unless they were suggested to her; that he made no test to determine her mental competency, but based his opinion upon her weakened physical and mental condition resulting from the progress of the disease.  He further said:

"The disease that she was suffering from is one that we call locomotor ataxia, or disease of the spinal cord, and nerves coming from it; and the peculiarity of that disease is the general loss of power:  First, local loss of power generally in the lower limbs, and that is progressive, goes from bad to worse.  There is connected with it loss of flesh, loss of nutrition.  Nutrition becomes poor, and if the patient lives long enough not only the spinal cord, but the general nervous system and the brain itself become affected, and the brain is somewhat hardened, and the optic nerves especially are liable to become affected, so that the patient may early become blind.  It is not necessarily the case that blindness occurs, but it may.  I wish to impress that it is a progressive disease, from bad to worse, and causes such great debility that the person before she dies is liable to be very weak and debilitated, and may be in various nervous conditions.  That is as far as I think it is necessary for you to understand what the case is, and how it leads to the termination, and what effect it has upon the general system, and through the general system on the brain itself.  The blood supply becomes poor; nutrition is poor; the person cannot assimilate food enough; the blood doesn't supply the brain properly, so that it becomes so dull that the person may be around but not know some things, somewhat disconnected, and at times not able to think in a consecutive manner; and this may come even before the brain itself has any organic disease.  It will in time.  Any organic disease is where a change takes place in the structure of the brain or in the nervous system, and the principal thing is that the nutrition becomes so poor, the ability to take food is poor, and the body is so poorly fed that it becomes thin to a mere skeleton, and the supply of blood to the brain is not sufficient to keep it in an active or normal condition."

He further testified that it was not merely because Miss

Hoyles was so poor physically that led him to say she was not able to make a will, but it was his knowledge of her condition and the disease, and its progress, from which she was suffering; that, while he did not gain this information by any tests, he did gain it from observation and anxiety to know the condition of the woman, as she was, and had for years been, a great friend of the family.

Dr. Blake was really the only witness offered by the contestants to show mental incapacity. There were a number of witnesses who testified on behalf of the proponent; but a careful examination of the record will disclose that many of these witnesses, upon cross-examination, gave evidence tending to strengthen the position of the contestants. For instance, the witness Mrs. Polglase, the wife of Dr. Polglase, testified to an intimate acquaintance with Miss Hoyles. She saw her about a week after the will in question was made. Again she saw her in July, just before her death, when she was helpless. She testified:

" The last of June she could help herself a little. The last visit she would need some one to help her out of the chair. Up until the last visit I did not see much change in her. The condition was practically the same all the spring, May and June. She looked pretty bad to me. Her flesh was gone, and she was a mere skeleton. Skin drawn over her face. There was nothing but the bone, and it was surprising to think that she knew what she was doing. She had barely enough vitality to live."

There was other evidence that Miss Hoyles was totally blind during the last two weeks of her life. The witness Mary Osborne, one of the legatees in the will, wrote to Mrs. Briggs, one of the sisters of testatrix, on July 19, 1906, detailing the circumstances of her death. She said:

" During the winter she could not walk because of abscesses which formed on foot and knee. From that time there were few meals that she ate with us. We had to carry them to her. Gradually her appetite failed, and this, of course, reduced her strength. During June she failed very fast. We supposed Mrs. Blake told you of

Miss Hoyles' condition.    Miss Hoyles became blind about
two weeks before she died, and was unable to help herself
in any way for about three weeks.    It was certainly piti-
ful to see her.    The last week she was so weak she
couldn't utter a whole sentence at a time."

It is worthy of note that in the will of June 19th no ref-
erence was made to the will of April 27th.    In fact, Mr.
Hoyles testified that testatrix did not tell him of the
former will, and that he had never seen it, and did not
know its contents, but had learned from Mrs. Blake that
such former will had been made.    There was other testi-
mony that he did know its contents and said he had read it,
and that the last will was not satisfactory, but was better
than the first one.    He testified that he drew the will from
memoranda which he had made at dictation of testatrix;
that after drawing the will he read it to her twice; and that
she said it was right.    Contestants claim that here was
evidence of suggestion.

1. This raises the principal question in the case.    The
correct rule is well stated in a number of the cases cited
by counsel for proponent.    In *White* v. *Bailey*, 10 Mich.,
at page 161, Justice CAMPBELL, speaking of the testimony
of medical experts, said:

"Dr. Blumerick was introduced, apparently as a medi-
cal expert, to give opinions not supposed to be receivable
from others.    Undoubtedly there are many cases in which
medical witnesses can do this.    They may sometimes,
where a question arises upon the proper scientific conclu-
sions depending on facts sworn to by others, give their
opinions upon a hypothesis presented to them, as to what
such facts denote.    Before doing so, however, the witness
must be examined as to his qualifications as an expert.
But when he is examined concerning facts which have
occurred under his own observation, and his opinion is re-
quired concerning the proper inferences from those facts,
he occupies, as to the facts themselves, the same position
with all other witnesses, although there may be some ques-
tions arising out of the facts, which he can answer, and
which others cannot.    Upon questions of mental capacity,
even nonprofessional witnesses may give evidence, not
only of specific facts and conduct falling under their own

observation, but also of the impression they derived at the time, involving to some extent matters of opinion. The difference between them and those who, in addition to being eyewitnesses, are also experts, is *that there may be peculiar indications which the latter understand better, and concerning which they can express an opinion as scientific deductions, and not mere common sense inferences.* But neither class can be allowed in any case to give an opinion upon mental capacity or condition, without first showing the circumstances and facts upon which that opinion is based. This is necessary for two reasons: *First,* it is necessary in order to enable other experts to determine whether the opinions expressed by the witness are correct, and to enable the parties to contradict them, if wrong. *Second,* it is necessary in order that, if an opinion is given on a mistaken or perverted statement of facts, the truth may be elicited from others to destroy the foundation of the conclusions. And a third reason might be mentioned, which is that the court and jury may know, from his opportunities, what means the witness had of forming any opinion at all. These are rudimentary principles which cannot safely be departed from."

In *Kempsey* v. *McGinniss*, 21 Mich., at page 138, Justice CHRISTIANCY said:

"But in case of such professional witnesses, as well as in that of unprofessional witnesses, who are allowed to give their opinions only from personal observation, the facts upon which the opinion is founded must be stated, and the jury must be left to determine whether the facts stated, as well as the opinions based upon them, are true or false."

In *Beaubien* v. *Cicotte*, 12 Mich., at page 502, Justice CAMPBELL said:

"The general doctrine is that all witnesses speaking from observation must, as far as possible, state such facts as they can give as the basis of their opinion. This rule does not require them to describe what is not susceptible of description, nor to narrate facts enough to enable a jury to form an opinion from those alone. This would be impossible; and, if it could be done, there would be no occasion for any opinion from the witnesses. It is a matter of daily experience that the opinion of an intelligent

and familiar eye-witness is the only satisfactory means of ascertaining mental condition, or disposition, or expression, or any other of those impalpable but important facts upon which men rest in dealing with each other. There is no substitute for personal observation. But, if witnesses were not compellable to state such facts as are tangible, there would be no means of testing their truthfulness. * * * But no testimony can be of any real value, unless it appears the witness had adequate means and opportunities for forming some conclusion."

See, also, *Prentis* v. *Bates*, 93 Mich. 241 (53 N. W. 153, 17 L. R. A. 494).

In *O'Connor* v. *Madison*, 98 Mich. 188 (57 N. W. 107), Chief Justice HOOKER, after referring to *Beaubien* v. *Cicotte, supra*, said:

"This opinion, if read in the light of the writer's opinion in the case of *White* v. *Bailey*, 10 Mich. 161, leaves no room for doubting that it is the settled law of Michigan that an opinion that a testator was incompetent can only be given when the witness has testified to circumstances upon which it is predicated, and which to some extent justify it. (Citing cases.) The extent to which such proof must go cannot be limited by an inflexible rule. It must depend upon the familiarity of the witness with the testator, the character of the disqualification, the nature and number of extraordinary circumstances detailed, and proximity to the act involved in point of time. Taken as a whole, they should move the judicial discretion of the trial judge, by apprising him that the witness may fairly doubt the competency of the person upon reasonable grounds; and this discretion must be carefully exercised."

See, also, *People* v. *Borgetto*, 99 Mich. 340 (58 N. W. 328); *Roberts* v. *Bidwell*, 136 Mich. 191 (98 N. W. 1000); *Sullivan* v. *Foley*, 112 Mich. 1 (70 N. W. 322).

In the light of this record, and of the decisions cited above, we are of opinion that it cannot be said that Dr. Blake did not have the opportunity and means, and sufficient familiarity with the condition of the testatrix, to enable him to express an opinion as to her mental capacity. We think that he stated sufficient grounds upon which to base an opinion to warrant the court in per-

mitting his evidence to go to the jury. The facts were within his own observation. He gave the reasons for this opinion, referring to the appearance of the testatrix, and the progress of the disease. There was proximity in time; he having seen her only three days before the alleged will was made, as well as a few days thereafter, and down to her death. The facts and circumstances stated by him were sufficient, in our judgment, to move the judicial discretion of the trial judge, and, in permitting this evidence to go to the jury, we think there was no error.

2. It is also urged that the verdict was against the weight of the evidence, and it is claimed that the circuit judge so held in denying the motion for a new trial.

The question of undue influence was withdrawn from the jury, and the sole question was as to the mental competency of the testatrix. There was evidence *pro* and *con* upon this last question, and in our opinion it presented a fair question of fact for the jury to consider, and the burden of proof was on the proponent. *In re Mansbach's Estate*, 150 Mich. 348 (114 N. W. 65). While the language of the circuit judge would indicate that in his opinion the verdict was contrary to the weight of evidence, it is evident that he thought there was a conflict in the evidence, and that the verdict was not so clearly against the weight of the testimony as to call for a vacation of the verdict, for he refused to disturb it. The verdict certainly was not contrary to the undisputed evidence, as was the case in *County of Montmorency* v. *Putnam*, 144 Mich. 135 (107 N. W. 895), cited by the circuit judge. In *Stevens* v. *Michigan Soap Works*, 134 Mich. 350 (96 N. W. 435), this court held that the verdict of a jury will not be set aside, on writ of error, on the ground that it is against the weight of the evidence, unless it clearly appears it is against the overwhelming weight of the evidence. That cannot be said here. In *Lovely* v. *Railway Co.*, 137 Mich. 653 (100 N. W. 894), Justice Montgomery, speaking for the court, said:

"The case must be a very clear one, affording very strong evidence that the verdict is the result of bias or prejudice, to justify this court in overturning a decision of the trial judge adverse to a new trial on this ground"

—viz., on the ground that the verdict was opposed to the great weight of the evidence. We cannot say that the verdict was not supported by evidence, nor that it was at variance with the great preponderance of the evidence; nor can we see any indication of passion or prejudice on the part of the jury. They found a verdict for contestants upon a fair issue of fact, and under proper instructions. We find no prejudicial error in the record.

The judgment of the circuit court is affirmed.

BIRD, C. J., and McALVAY, BROOKE, and BLAIR, JJ., concurred.