*In re* GANUN'S ESTATE.

GANUN *v.* GANUN.

1. EVIDENCE — WILLS — ADMISSIONS OF ONE OF SEVERAL BENEFICIARIES—UNDUE INFLUENCE.

On the contest of a will for undue influence, evidence of statements or admissions made by proponent, executor of the estate, who was one of the beneficiaries, tending to prove undue influence, was incompetent because the rights of other beneficiaries standing in no relation of privity should not be prejudiced by his unsworn declarations.[1]

[1] Evidentiary force of circumstance that one benefited by a will was the draftsman thereof, or was active in procuring its execution, see note in 28 L. R. A. (N. S.) 270.

2. WILLS—UNDUE INFLUENCE—EVIDENCE.

> Opportunity for wrongdoing is not alone sufficient to establish undue influence: there must be, also, evidence of acts or circumstances from which the jury might find that the influence was exercised.

3. SAME.

> Where it was contended that the son and widow of testator influenced him unduly in the making of the will, but the testimony showed he was of sound mind, and desired to make the disposition that he made of his estate, that he consulted two reputable attorneys before it was drafted, and a considerable interval elapsed after the consultations before he gave final instructions for its preparation, going alone in each instance, that only the lawyer who drew the instrument knew of its existence until after the death of testator, some two years and eight months after executing the testament, the court should have instructed the jury that undue influence was not shown.

Error to Lenawee; O'Mealey, J.   Submitted January 7, 1913.   (Docket No. 12.)   Decided March 20, 1913.

Francis Ganun presented for probate the last will of Nathan Ganun, which was contested by Addison Ganun and Newman J. Ganun.   From an order of the probate court granting the petition, contestants appealed to the circuit court.   Judgment for contestants.   Proponent brings error.   Reversed.

*Smith, Baldwin & Alexander*, for appellant.

*John A. Riley* and *Jacob N. Sampson*, for appellees.

BROOKE, J.   The will is contested upon the ground of undue influence only.

In February, 1908, Nathan Ganun, the testator, being then 71 years of age, made a will which was made operative by his death in October, 1910.   He left surviving him a widow and four children.   At the time the will was executed, Frank, the eldest son, was 50 years of age, Addison was 48, Newman 46, and Melvina 44.   All were married and had children, most of whom had reached

maturity at the time of the death of testator. The estate amounted to some $28,000. By his will testator gave to his widow during her life the income from the entire estate; to his daughter, Melvina, $4,000. To each of his two sons, Addison and Newman, he gave the income during life from $5,000, with remainder over to five of Frank's children—to Oliver (Frank's son) 40 acres of land, to Cecil (Frank's son) $2,000, to Raymond (Frank's son) $2,000. The residue of the estate he gave to his son Frank, and appointed him executor. Three other children of Frank's were not mentioned in the will, and no bequest was made to any of the other grandchildren. Addison left home when about 21 years of age, and Newman at about the age of 26. Frank lived with his father until his marriage, and thereafter upon a farm very close to that of his father. Up to the time of the death of the testator, he continued to work with his father upon his father's farm as well as upon his own. Two of Frank's daughters were practically reared in the testator's home, and the relations between the testator and his wife and Frank and his family were very intimate. During the last 15 years of testator's life, Newman and Addison lived in Toledo, Ohio, and the daughter, Melvina, in a western State. These children visited their father, the testator, at comparatively rare intervals, though they as well as their children were upon friendly terms with him. Testator was a man much opposed to the use of intoxicating liquor as a beverage. There is testimony in the record tending to show that the son Addison was somewhat addicted to such indulgence, and that his father disapproved of his course. The record likewise shows that testator assisted Newman to start a mercantile business which after two or three years proved to be unremunerative. Newman quit the business. The testator was held as a partner, and was obliged to pay the debts of the concern to a considerable sum—probably about $3,000. Newman worked as a bartender for about six months, and for a short time owned and operated a saloon.

The following testimony was admitted over the objection of proponents: Lydia J. Bancroft, mother of Addison's wife, testified:

" *Q.* Just tell the jury what conversation you heard between Frank and your daughter?
"*A.* I heard him tell Addision that he would see that he didn't have any of his property to spend."

Clara Ganun (Addison's wife) testified:

"*Q.* State as nearly as you can the exact language used by Frank and by Addison that day.
"*A.* Frank said that he would see to it that the two boys didn't have any of that property to spend."

The date of this conversation is fixed as of January, 1908; the will being executed in February, 1908. Alfred Hart testified:

"*A.* She (Jane Ann Ganun, testator's widow) at one time said that Newman or Addison wouldn't get any of the property as long as she and Mr. Ganun lived. * * * She said something about Newman wanting the farm down there, or the boys wanting the property, and she said they wouldn't get it until they got done with it."

Newman Ganun testified:

"*Q.* What did she (Jane Ann Ganun) say at that time?
"*A.* Well, she said she would see that it was fixed so they wouldn't get any of it. * * *
"*Q.* I ask you if you and Frank did have a talk about property matters in the barn at your father's homestead. * * *
"*A.* The conversation in the barn, well, I drove into the barn, and he came in there. Of course, this was after the will was probated, and the first question he says to me, he says, ' I don't want you boys to think that I have taken advantage of you here;' and he wanted me to come up there and frame up some kind of a settlement, and he went on and we talked about that. Then we went over there to the house, and talked there some, and, of course, in this talk that day there was nothing much brought out only he didn't take advantage of us, and he wouldn't

make the settlement and give us or buy us a farm. Of course, he had lots of provisions in this agreement, and one thing and another, and I told him I couldn't agree to anything of that kind under the condition that was, but, of course, he wouldn't make it unless my brother Addison would do the same thing as me. At that conversation Frank said that the first he knew there was a will was either on the day or the next day after father's death. Mother came to him, and told him that she found a receipt for a will, and that is the first that he ever knew there was a will. There was no further talk between us about the will. I told him that it was the most damnable piece of business that I ever saw gotten up. I have told all I remember about the conversation with Frank in the barn. I had another conversation with him in the house. Mother, Frank, and I were talking, and I said to Frank, ' You told me in going to Blissfield a couple of weeks before that, or three weeks before that, a couple of weeks before father died, that Ollie was going to get that 40 acres, and, if I had stayed on the 120, I would have had something, and you claimed you were worried because you would have Addie's money to look after;' and I says, ' How did you know these things if you didn't know there was a will ?' and him and mother both spoke at the same instant, ' We surmised it.' "

Proponents' rights were duly preserved by timely objection or motion to strike out.

It is the contention of appellants that all the foregoing testimony was improperly admitted, for the reason that by making proof of statements or admissions made by Frank and his mother, Jane Ann, having a tendency to defeat the will, the rights of other legatees under the will who were not jointly interested with Frank or his mother were swept away. Assuming, for the moment, that the evidence quoted was such as to support an inference of undue influence, was it admissible ? The question was first passed upon in this State in the case of *O'Connor* v. *Madison*, 98 Mich. 183 (57 N. W. 105), where it is said :

" The question was referred to by this court in *Re Estate of Lambie*, 97 Mich. 49 [ 56 N. W. 223], where the declarations of one who was devisee of the entire estate

were held admissible. But we think that the rule does not extend to cases where there are several interested in sustaining the will, as in this case."

An examination of the original record in this case shows that the legatees, evidence of whose declarations was held to have been properly excluded, were neither of them named as executors, and were therefore not formal parties in the suit. *O'Connor* v. *Madison* was followed as settled law in *Re Estate of Lefevre*, 102 Mich. 568 (61 N. W. 3). It was again followed in *Roberts* v. *Bidwell*, 136 Mich. 191 (98 N. W. 1000), and in that case it was held that evidence of the declarations of Brant Roberts was not admissible. Brant Roberts was one of the executors named in the will, himself filed the petition for its probate, and was a formal party in the proceeding. In the case of *In re Loree's Estate*, 158 Mich. 372 (122 N. W. 623), a verdict was directed for the proponent at the conclusion of the testimony, upon the ground that no evidence of undue influence had been produced. The evidence was examined in this court, and it was said:

"A consideration of all of the evidence in the case does not support the conclusion of the court." A re-examination of the record in that case convinces us that this conclusion was warranted, based upon the evidence which was admitted by the trial court. In that case Catharine Loree was one of many legatees, and was executrix and proponent of the will. We there said:

" Statements (declarations) made by her at other times, whether in testator's presence or absence, were material upon the question of undue influence and her attitude towards these contestants."

The admissibility of evidence of declarations of Frank and Jane Ann Ganun in the case at bar is predicated upon this language. It will be noted that in the *Loree Case* there is no discussion of the authorities upon the question. It is clear, under all the authorities, that evidence of declarations or admissions of Jane Ann Ganun, she being

neither executrix nor proponent, were inadmissible. Does the fact that Frank Ganun is both executor and proponent make such evidence admissible as to his declarations? We think not. As we have seen, such evidence was excluded in the case of *Roberts* v. *Bidwell, supra.* In the early case of *Shailer* v. *Bumstead,* 99 Mass. 112, cited with approval in *O'Connor* v. *Madison, supra,* it is said:

" In connection with the evidence thus offered and rejected, the contestants offered also the declarations and conduct of Hayden and Shailer, named executors, subsequent to the date of the will. And this brings us to another important question in the case. The evidence, for the purpose for which it was offered, was, we think, properly excluded. It was not proposed thereby to contradict their testimony. The admissions of a party to the record against his interest are, as a general rule, competent against him; and this rule applies to all cases where there is an interest in the suit, although other joint parties in interest may be injuriously affected. But it does not apply to cases where there are other parties to be affected who have not a joint interest, or do not stand in some relation of privity to the party whose admission is relied upon. A mere community of interest is not sufficient. Devisees or legatees have not that joint interest in the will which will make the admissions of one, though he be a party appellant or appellee from the decree of the probate court allowing the will, admissible against the other legatees.   *   *   *   Before the death of the testatrix, the interest of all these parties in a will, liable at any time to be revoked, was not such a direct interest as should render their admissions competent against other parties. The separate admissions of each, made after the act, that the will was procured by their joint acts of fraud or undue influence, cannot be permitted to prejudice the other "—citing many cases.

The identical question was passed upon in the case of *McMillan* v. *McDill,* 110 Ill. 47, where evidence of declarations of Robert McMillan, the executor of the will, was held to have been improperly admitted, although the trial court received the evidence as against him alone, and not against his codefendants. See cases cited. See, also,

Gardner on Wills, p. 201, and cases cited in note, and on page 142; Schouler on Wills and Administration, p. 120, and note. Upon principle we think it is clear that the mere fact that one of several legatees is named as executor, and thereby burdened with the duty of proposing the will for probate, should not make evidence of his declarations admissible as against his colegatees when otherwise such evidence would be incompetent. Instances may readily be imagined where an executor with a negligible interest under the will would be largely benefited by having the will set aside and the estate distributed under the statute of descent. In such a case the temptation to make declarations as to mental incompetence or undue influence is evident, and proof of such declarations might not only greatly advantage the declarant, but sweep away the rights of the other legatees under the will. It should be noted that twice since the *Loree Case* was decided this court has distinctly reaffirmed the principle of *O'Connor* v. *Madison*. *In re Hewitt's Estate*, 161 Mich. 536 (126 N. W. 848, 21 Am. & Eng. Ann. Cas. 47); *In re Mc-Master's Estate*, 163 Mich. 210 (128 N. W. 259). In the latter case, upon the facts, it was held that the case was outside the rule. So far as the language used in the *Loree Case* can be construed as questioning or changing the rule, it must be disregarded. As before pointed out, it was not necessary to the decision.

We have discussed this question somewhat at length in order that there may be no doubt among the profession as to the true rule in such cases, and we have assumed in the discussion that the testimony in question had a legitimate tendency to establish undue influence upon the part of Frank Ganun or his mother. We think it doubtful whether the evidence (even if admissible) has any such probative force. Nathan Ganun was a man of strong mental and unusual physical equipment. He was hard-headed, frugal, and industrious. He was a man of affairs in a limited way, careful of his business, and jealously retained full control thereof until more than two years after the

will was executed. Jane Ann, his wife, and Frank, his eldest son, were his closest and most intimate associates. It may be said that both had abundant opportunity to practice fraud or to exercise undue or unlawful influence upon the testator.

But, under the law, opportunity alone for wrongdoing is not sufficient. Outside of such opportunity, there must be evidence of acts or circumstances from which the jury may find that the fraud was perpetrated—the undue influence exercised. We have read the record with care, and are unable to find any testimony which even remotely indicates that either Frank or his mother influenced or sought to influence the making of the will.

Both had a perfect legal right to persuade the testator to leave his property as he did, and, if they had done so, the will would still stand as testator's will, if at the time of its execution he was of sound mind and the instrument represented his own desires in the premises. The record shows that the testator consulted two reputable lawyers before the will was drawn; that some time elapsed after such consultations before he gave final instructions for its preparation; that he went alone in each instance; and (excluding the testimony improperly admitted) that no one except the lawyer who drew the will knew of its existence until after the death of the testator. Considering the character of the testator for thrift and industry and his principles (or prejudices) as to the use of intoxicating liquors, the disposition he made of his estate should create no unfavorable comment. At any rate, it was his estate, and he had the unquestioned right to make such disposition of it as he saw fit. He made his will and lived for two years and eight months thereafter, during all of which time he was in full possession of his mental faculties and transacted his business, but made no change in his will. We are of opinion that the motion to direct a verdict for proponents at the close of contestants' case should have been granted. Many errors are assigned upon the refusal of the court to give proponents' requests to charge and upon

the charge as given. Our conclusion upon the principal question renders discussion of those assignments unnecessary, though some of them are not without merit.

. The judgment is reversed, and a new trial ordered.

STEERE, C. J., and MOORE, KUHN, STONE, and OSTRANDER, JJ., concurred. MCALVAY, J., concurred in the result. BIRD, J., did not sit.